Filed 3/29/16

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C072880 |
| Plaintiff and Respondent, | (Super. Ct. No. SF118509A) |
| v. | |
| RICHARD ADRIAN YBARRA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Terrence Van Oss, Judge.  Affirmed.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Eric L. Christoffersen, Supervising Deputy Attorney General, Jesse Witt, Deputy Attorney General, for Plaintiff and Respondent.

---

[*]  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

1

Defendant Richard Adrian Ybarra appeals from a judgment of conviction following a jury trial. Defendant was charged with multiple counts related to two incidents -- a group attack on a fellow prison inmate and a separate battery by gassing on a correctional officer. A jury found defendant guilty on five of seven counts. Defendant was sentenced to state prison for a term of thirteen years.

On appeal, defendant contends that: (1) the trial court erred in denying his motion to sever the counts arising from the assault on the inmate from the counts arising from the gassing of the correctional officer; and (2) there is insufficient evidence to support the verdicts related to the inmate assault because the accomplice testimony was insufficiently corroborated.

In the published portion of this opinion, we conclude that the trial court properly denied defendant's severance motion because at the time the motion was made, defendant did not demonstrate prejudice and he has failed to demonstrate gross unfairness amounting to a due process violation based on anything that transpired during the trial. In so concluding, we hold that a defendant cannot show prejudice or gross unfairness amounting to a due process violation based on testimony he or she gives later in the trial. In the unpublished portion of this opinion, we conclude that there was sufficient corroboration of the accomplice testimony.

We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

**The Charged Offenses and Enhancements**

In the first incident, defendant was charged with attempted deliberate and premeditated murder (Pen. Code, §§ 664/187, subd. (a) (count one)),[1] assault with a deadly weapon (§ 245, subd. (a)(1) (count two)), prisoner in possession of a weapon

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

(§ 4502 (count three)), assault by a prisoner with a deadly weapon (§ 4501 (count four)), and street terrorism (§ 186.22, subd. (a) (count five)). Additionally, defendant was charged in counts one and two with personal infliction of great bodily injury (§ 12022.7, subd. (a)) and personal use of a deadly or dangerous weapon (§ 12022, subd. (b)(1)). In counts one, two, three, and four, defendant was charged with a gang enhancement (§ 186.22, subd. (b)(1)).

In connection with the second incident, defendant was charged with battery by a prisoner (§ 4501.5 (count six)), battery by a prisoner by gassing (§ 4501.1 (count seven)), and street terrorism (§ 186.22, subd. (a)).

## The Prosecution's Trial Evidence

### The First Incident - Assault on an Inmate

Sergeant Michael Villanueva testified that on the morning of October 4, 2010, he was monitoring the yard at Deuel Vocational Institution ("DVI") in Tracy, California, when he received a radio transmission reporting a fight in the yard. He called for assistance and instructed the tower to announce over the "P.A. system" that all inmates were to lay down on the ground. Sergeant Villanueva then turned toward the exercise area in the yard and saw three inmates punching and stabbing another inmate. He observed a fourth inmate running away from that area. He observed one of the three assailants, unidentified at that time, flee the area before he and the other officers reached the victim and arrested two of the assailants, inmates Hugo Amaya and Christopher Colon. Additionally, the officers chased and arrested inmate Christopher Henderson and defendant's brother, inmate Michael Ybarra, who were fleeing the area and suspected to be involved. He did not identify defendant as one of the people involved in the assault or as someone he saw fleeing the immediate area. Sergeant Villanueva testified that the area of the yard where the attack occurred was typically used by the Northern Hispanic inmates.

3

Correctional Officer Ray Castellon testified that there were approximately 400 inmates in the yard at the time of the attack. He testified that he responded to the tower's report of a fight in the yard and arrived in time to observe two inmates, Amaya and Colon, beating and kicking the victim. Officer Castellon pepper-sprayed the assailants to stop the assault. He testified that Amaya and Colon did not have weapons on or near them. Officer Castellon explained that based on his experience with Northern Hispanic gang assaults, he believed Amaya and Colon were "bombers." He went on to explain that the "bombers are the people who direct the incident away from the person who actually did the stabbing and cutting," allowing the prisoners with weapons, called "hitters," to get away while the bombers continue to attack the victim without weapons. Officer Castellon testified that he did not see defendant in the yard.

Correctional Officer Rudy Martinez testified that he was monitoring the prison yard on the day of the attack when he saw inmates running from the exercise area. He then saw three inmates striking the victim with their fists. One of them walked away and handed an object to inmate Henderson, who threw it over the fence. Officer Martinez testified that he then pursued and detained Henderson and the inmate who had handed off the object. Martinez testified that he recorded the last name of the person who handed the object to Henderson as Ybarra.[2]

Correctional Officer Jamie Silk testified that at the time of the attack, he was assigned to the Investigative Services Unit. He testified that he responded to the scene of the attack and began searching the area for weapons. He found a "white state-issued towel, torn into a piece, and a plastic cellophane sheath on it with feces." He explained

---

[2] Officer Martinez could not positively identify defendant as the Ybarra he detained. He testified that he recorded only the last name of that individual and did not note the first name or first name initial. He testified that later on in the holding tank, defendant insisted that Officer Martinez chased his brother, Michael Ybarra.

that the sheath appeared to be designed to "protect the sharpened point of an inmate-manufactured weapon," particularly when such a weapon is hidden in an inmate's rectum. He opined that the towel was used to wipe off the item after it was removed from the rectum. Officer Silk further testified that there were three weapons found in the yard -- two slashing weapons and one stabbing weapon.

Correctional Officer Johnny Rey testified that he arrived to the yard after the fight. He began searching the immediate area and did not find any weapons near Amaya and Colon. He testified that after broadening his search area, he found two inmate-manufactured razor blade "tomahawk" weapons "[j]ust inside the fence line behind the exercise area." He further testified that he found another object outside the fence -- an inmate-manufactured "pieza," a stabbing weapon, with blood on it. Officer Rey testified that the following day, he attempted to interview the victim, who was receiving medical treatment for his injuries, but he was not cooperative.

San Joaquin County Sheriff's Office Correctional Officer Marco Mendoza interviewed defendant in the San Joaquin County Jail for classification purposes in May of 2012. Defendant told Officer Mendoza that he is an active Norteño from Yuba City. Mendoza documented defendant's tattoos. Defendant had four dots on the left side of his face, which Mendoza testified represents Norteño, and he had " 'SK' " on his right arm, which defendant told Mendoza stood for " 'scrap killa.' " Defendant was housed in the jail with other Norteños without incident.

Correctional Sergeant Corey Johnson testified that he investigated the attack. Sergeant Johnson was also the supervisor for the Institutional Gang Investigators (IGI) unit at the time of the attack and testified as an expert witness on criminal street gangs and their activities. He testified that in his experience, the attack was consistent with how Northern Hispanics, including Norteños, perform a "removal" of one of their members

that they deem "no good."[3]  He further testified that the Norteños are a criminal street gang within the meaning of section 186.22, subdivision (f), a fact that is not in dispute here.  He opined that based on defendant's tattoos and his own admission, as well as his criminal history, defendant was an active Norteño at the time of the attack.  He also testified that he learned from a disassociating Norteño member that defendant held the position of tier security for the Norteños while in California State Prison, Solano.  Sergeant Johnson opined that the attack was done at the direction of, "at the association of," and for the benefit of the gang.

Sergeant Johnson further testified that he was familiar with both defendant and his cellmate, Carlos Leal, prior to the attack.  Although he did not know defendant's name, Sergeant Johnson had seen defendant between 10 and 20 times before the attack.  Sergeant Johnson testified that based on his review of security video recording of the attack, he could identify defendant as the first hitter and Leal as the second hitter.  He also identified defendant's brother, Michael Ybarra, as being in the area of the attack.  Also from his review of the video, he identified Amaya and Colon as the bombers and Henderson as the person who disposed of the weapons.  Sergeant Johnson explained that he identified defendant as the first hitter in the video based on the way defendant carries himself and his walk, his high, broad shoulders, as well as his size, height, and baldness.

Sheltri Gresham, a senior criminalist for the California Department of Justice, testified that she conducted DNA analysis involving seven known reference samples.[4]

---

[3] Sergeant Johnson explained the hierarchy of Northern Hispanic gangs in state prison, which includes Norteños, Northern Structure, and Nuestra Familia, the latter of which is also known as NF.  After the NF members were sent to special housing units (SHU), they formed the Northern Structure who work under the guidance of the NF.  The NF are the leaders and the Northern Structure and Norteños are under them.

[4] The reference samples came from Amaya, Colon, Henderson, Leal, Michael Ybarra, defendant, and the victim.

She explained that the process includes looking at 15 "target regions" or "loci" of DNA and assigning "all of those pieces a numerical value," the total of which represents a DNA profile.

Gresham testified that DNA samples from each of the slashing weapons matched the victim as a major contributor. There was also DNA from a minor contributor on the handle of the slashing weapons that was inconclusive because there was insufficient DNA to reflect an entire profile. However, Gresham could not exclude Leal as being the minor contributor of the DNA on the "sharpened end area" of one of the slashing weapons because the portion of the DNA profile that was present was consistent with Leal's DNA.

Gresham testified that a swab from the handle of the stabbing weapon had a mixture of DNA with at least two major and two minor contributors. While there was insufficient DNA for conclusive results as to the minor contributors, Gresham was able to include both defendant and Leal as "possible" major contributors of the DNA. She testified that the victim was a major contributor to DNA on the sharpened end of the weapon.

Gresham explained her characterization of "possible" major contributor. She testified that when there is a mixture of major contributors, there are multiple combinations of the numbers. She explained that the numbers are listed in pairs, because a person gets one number from their father and another from their mother. Because she detected two major contributors, there were at least three or four major contributor numbers at each loci of the DNA and it is not possible to identify which ones are necessarily paired together. Consequently, she took account of all possible combinations at each location of the DNA. One of those combinations matched defendant at each location and another combination at each location matched Leal. In other words, comparing their individual profiles to this mixture reveals that one of those combinations at each location would match the profiles of Leal and defendant. None of the other five

7

people for which Gresham had reference samples (see fn. 4, *ante*) could be included as major contributors to the DNA on the handle of the stabbing weapon. Using a software program, Gresham determined that "[t]he combination of genetic types for all possible individuals who could not be excluded as major contributors in this mixture is estimated to occur at random among unrelated individuals in approximately 1 in 660 million African-Americans; 1 in 110 million Caucasians; and 1 in 86 million Hispanics."

When asked on cross-examination if it was possible that defendant was not a major contributor to the DNA found on the stabbing weapon, Gresham said that it was, but then explained that if one was "to take a random sampling of 86 million people," only "one of those people would have one of [the] possible combinations at each location." She also stated on cross-examination that it is possible that DNA could be left on an object by picking it up, brushing by it, or rubbing a shirt on the object.

Henderson pleaded guilty to section 245 and "being involved in a gang-related crime." Testifying as a prosecution witness, Henderson said that he and the victim were both Norteños and that the victim was a "big homey" within the gang. A "big homey" is a "shot caller." Henderson testified that shortly before he was up for parole, he received a written communication that said there was going to be a removal of the victim in which he was instructed to dispose of the weapon. Henderson testified that Amaya said he would be a bomber in the attack. Henderson further testified that on the day of the attack, he spoke with Leal and found out that Leal would be one of the hitters and would pass Henderson a weapon after the first phase of the attack.

Henderson testified that at the time of the attack, he was in the exercise area in the Northern Hispanic part of the yard when he saw defendant reach around the victim and slice his face. Henderson then saw the victim try to run away with blood dripping down his neck and saw Amaya and Colon chase him. Henderson testified that Amaya and Colon began hitting the victim with their fists and then Leal came up and stabbed the victim. Then Leal ran away and passed Henderson a weapon while the bombers

8

continued to beat the victim. Henderson testified that he then threw the weapon over the fence.

Henderson testified that he initially lied to Sergeant Johnson in his first interview after the assault but later told him who was involved and that he was willing to testify. He identified defendant, Leal, Amaya, and Colon out of photo line-ups as the individuals who participated in the attack as hitters and bombers. He said defendant's brother, Michael Ybarra, was not part of the attack.

Henderson testified that in his opinion, the attackers did not intend to kill the victim but instead they intended to mark him as a "no good" Norteño. The attack was gang-related.

Henderson did not receive a plea deal in exchange for his cooperation. He explained that he wanted to testify because he "felt what happened was wrong and [he] was used." He explained that he had dropped out of the gang.

Amaya pleaded guilty to section 245, "committing . . . great bodily injury," and "being a part of a gang-related crime," and was sentenced to five years. He testified for the prosecution in exchange for a shorter sentence. Amaya testified that he was an associate of the Norteños. He explained that prior to the attack, he received a written message on a small piece of paper, referred to as a "kite," asking him to stab someone. He wrote back that he was not comfortable with using a weapon because his sentence was almost up, but he would be willing to participate as a bomber if needed. Amaya was then instructed to be a bomber in the removal and received another kite with the "order of operation" and a visual breakdown of the removal. According to the plan, a "slasher" was supposed to get behind the victim and slash his face and neck area, then a hitter would stab him, and then the bombers were supposed to hit the victim to divert attention and "[take] the rap." Amaya testified that he spoke with defendant, Leal, and Henderson on the day of the attack in preparation. Amaya testified that he asked defendant, the

9

slasher, not to cut any major arteries because Amaya did not want to take the rap for murder. Defendant responded, " 'Don't trip.' "

Amaya testified that the participants all gave a nod to each other to signal they were ready when the victim went to the exercise bars. Defendant then came up behind the victim and cut him in the face as planned. Amaya testified that Leal was supposed to stab the victim at this point but took too long and the victim began to run. He and Colon caught up to the victim and began hitting him. Then Leal came in late and stabbed the victim four or five times and handed off his weapon to Henderson.

Amaya testified that the attack was gang related and directed. He said Michael Ybarra was not involved but he was mistakenly arrested in the initial confusion about who was involved.

### The Second Incident - Gassing of a Correctional Officer

Sergeant Fernando Navarro, a transportation sergeant for DVI, testified that he transported defendant and other inmates to the San Joaquin County Superior Court. Defendant was placed in a holding cell on the third floor of the courthouse designated for DVI inmates. Sergeant Navarro noticed defendant and Officer Olivas having an exchange that escalated. Defendant refused to comply with Officer Olivas's instructions to sit down in the holding cell. Sergeant Navarro directed Officers Olivas, Hutchinson, Prum, and Casillas to physically force defendant to sit down and restrain him. Sergeant Navarro then saw defendant stand up again. He testified that defendant then said, "[F]uck you, bitch," to Officer Casillas and spit at him. Navarro saw the spit contact Officer Casillas's face. Officer Hutchinson forced defendant to sit down again and Officer Casillas placed a spit mask and hood on defendant. Sergeant Navarro testified that he was aware that defendant was a Norteño and discovered after the incident that the inmate sitting next to defendant was associated with the Southern Hispanics, a rival gang of the Norteños. However, defendant never voiced any complaints or safety concerns

10

about sitting next to this inmate. Sergeant Navarro testified that defendant's complaint was that he did not want to be chained between his legs.

Correctional Officer Anthony Casillas testified that he observed Officer Olivas instruct defendant to sit down in the holding cell and defendant refused. Defendant said, " 'You ain't chaining me to the bench.' " Officer Casillas testified that Sergeant Navarro then instructed him and two other officers to help secure defendant to the bench. After defendant repeatedly refused to sit down, Officer Casillas grabbed him by his shirt to force him down while two other officers helped push him down. Officer Casillas testified that while he was holding onto defendant's shirt, defendant grabbed his right hand. As a result, Casillas received a cut to that hand. Once Officer Olivas secured defendant to the bench with a waist restraint, the officers all backed off of defendant. Officer Casillas testified that while he was backing off, defendant stood up and said, " 'Fuck you, bitch,' " and from a distance of about two feet, spit in Officer Casillas's face. Officer Casillas left the room to clean his face. He then returned to the holding cell and put a spit mask on defendant. Officer Casillas denied striking defendant at any time during this incident.[5]

### Defendant's Trial Evidence

Michael Ybarra testified for the defense. He testified that at the time of the inmate assault, he was standing in the exercise area and saw a man run past him, who was bleeding. He then looked for his brother as the officers called " 'yard down,' " and saw defendant on the track, approximately 100 yards from the exercise area, where the attack occurred. He also testified that after the attack, Henderson seemed "scared" and that Henderson indicated "he was willing to do anything to get out of it." Michael also

---

[5] Similarly, Sergeant Navarro and another witness, Officer Sam Prum, both testified that they did not see anyone hit defendant.

testified that Sergeant Johnson told him to tell his mother that defendant was never coming home.

Defendant also testified. As to the first incident, defendant testified that during the attack, he was walking around the track with another inmate. He readily admitted his affiliation with the Norteños but claimed he was never "tier security" for the gang.

As to the second incident, defendant claimed he was upset because he saw that another inmate was shackled from the sides rather than between his legs, and he requested to be shackled that way to allow for greater freedom of movement. Defendant also testified that he was concerned for his safety, although he did not explain the basis for this concern. He further testified that he asked to move to another holding room. When these requests were denied, defendant refused to sit down. Defendant initially testified that when the correctional officers were attempting to force him to sit down and he was resisting, Officer Olivas was choking his neck. Later in his testimony, defendant claimed it was Officer Casillas who grabbed his neck, and he further testified that one of the officers hit him. Defendant admitted that he spit on Officer Casillas. He testified that he was angry because he believed it was Officer Casillas who had hit him.

**Verdicts and Sentencing**

On September 19, 2012, the jury found defendant guilty on all counts except count one, attempted deliberate and premeditated murder, and count three, prisoner in possession of a weapon.[6] Additionally, the jury found all alleged enhancements on counts two and four to be true.

The trial court sentenced defendant to an aggregate term of thirteen years in prison, calculated as follows: the mid-term of three years on count two, assault with a deadly weapon (§ 245, subd. (a)(1)) with five years for the gang enhancement (§ 186.22,

---

[6] The trial court dismissed count eight, street terrorism, prior to instructing the jury.

subd. (b)(1)), three years for the great bodily injury enhancement (§ 12022.7, subd. (a)), and one year for the personal use of a weapon enhancement (§ 12022, subd. (b)(1)); the mid-term of four years on count four, assault by a prisoner (§ 4501) with five years for the gang enhancement (§ 186.22, subd. (b)(1)), stayed pursuant to section 654; the mid-term of two years on count five, street terrorism (§ 186.22, subd. (a)), stayed pursuant to section 654; the mid-term of three years concurrent on count six, battery by a prisoner (§ 4501.5); and one consecutive year (one-third the mid-term) on count seven, battery by a prisoner by gassing (§ 4501.1).

## DISCUSSION

### I. Motion to Sever

### A. Additional Background and Defendant's Contentions

In a pretrial motion in limine, defendant asked the trial court to sever the gassing counts from the inmate assault counts. Defendant argued that the counts pertaining to the gassing incident were unrelated to the counts pertaining to the inmate assault and "[t]he piling on of unrelated charges work to defendant's prejudice by acting as 'bad character' evidence. The evidence for the gassing case is strong and is against an authority figure, and will be inappropriately used to bolster the weak evidence on the attempted murder case." Defendant provided no factual or further legal analysis as to prejudice.

At the hearing on the motion, defense counsel argued that while both incidents involved assaults by an inmate, "on the one hand we have what the D.A. is going to argue is a gang-related assault on an inmate at the institution, here we have a battery that occurred up in the third floor of the courthouse. I would argue that they are two distinct and basically we are bootstrapping charges on to my client." No further prejudice analysis was provided by the defense. The trial court noted that there were likely different motives for the assault on the inmate and the assault on the correctional officer. The prosecutor responded that there was evidence at the preliminary hearing that both assaults were motivated by defendant's gang affiliation. The court then noted that these

13

are the types of crimes that are typically joined for judicial economy and asked defense counsel if he could provide any specific authorities to show why the counts in this case should not be joined. Defense counsel then responded that he was not aware of any such specific authority. The trial court denied the motion to sever.

Defendant contends the trial court abused its discretion in denying his motion to sever the counts relating to second incident, the gassing of a correctional officer (counts six, seven, and eight), from the counts relating to the first incident, the attack on the inmate (counts one through five). He argues that although the statutory requirements for joinder are met, the joinder was clearly prejudicial. He contends that the evidence was not cross-admissible in separate trials based solely on an alleged gang-related motive underlying both incidents. He further contends that the joinder allowed the prosecutor to emphasize defendant's "admission he was a gang member and his admission he assaulted the officer in the holding cell to portray [defendant] as a person of bad character, thereby increasing the likelihood he would be convicted on all the charges regardless of the weak identity evidence on the [inmate assault] counts."

### B. Analysis

### 1. Applicable Legal Principles

When two or more offenses of the same class of crimes are charged, the trial court, "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." (§ 954.) "The purpose underlying this statute is clear: joint trial 'ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' " (*People v. Soper* (2009) 45 Cal.4th 759, 772 (*Soper*).) Thus, "[b]ecause consolidation ordinarily promotes efficiency, the law prefers it." (*People v. Ochoa* (1998) 19 Cal.4th 353, 409.) The burden is on the defendant to

14

establish that the countervailing considerations of efficiency and judicial economy are outweighed by a substantial danger of undue prejudice. (*Soper*, at p. 773.)

In this case, because both incidents involved assaultive crimes and thus involved offenses of the same class of crimes, the statutory requirements for joinder were satisfied. Defendant does not contend otherwise. Given that the counts were properly joined, defendant can show the trial court erred in denying the motion to sever only upon a clear showing of prejudice, and we review the trial court's ruling for abuse of discretion. (*Soper, supra*, 45 Cal.4th at p. 774; *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).) A trial court's denial of a motion to sever properly joined charged offenses amounts to a prejudicial abuse of discretion only if that ruling " ' " ' " 'falls outside the bounds of reason.' " ' " ' " (*Soper*, at p. 774.)

In reviewing for abuse of discretion, we do not consider evidence that later came out during the trial. Rather, a reviewing court's determination of whether a trial court has abused its discretion in denying severance must be based upon the facts before the court at the time of the ruling. (*People v. Merriman* (2014) 60 Cal.4th 1, 37 (*Merriman*); *People v. Mendoza* (2000) 24 Cal.4th 130, 161 (*Mendoza*); *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1244.) "Refusal to sever on a defendant's motion might be an abuse of discretion where '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all; and (4) any one of the charges carries the death penalty.'[7] [Citations.] [¶] . . . 'The burden of demonstrating that . . . denial of severance was a prejudicial abuse of discretion is upon him who asserts it . . . .'

---

[7] Because this is not a capital case, the death penalty factor does not apply here.

[Citation.] A party seeking severance must 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*People v. Davis* (1995) 10 Cal.4th 463, 508.) And the potential prejudice must outweigh the state's strong interest in the efficiency of a joint trial. (*Merriman*, at p. 37.)

The determination that a trial court did not abuse its discretion does not end the analysis. Where a trial court's severance ruling is correct at the time it was made, a reviewing court will reverse the judgment if the defendant shows that joinder resulted in "gross unfairness" amounting to a denial of due process. (*Merriman, supra*, 60 Cal.4th at p. 46; *Soper, supra*, 45 Cal.4th at p. 783; *Mendoza, supra*, 24 Cal.4th at p. 162.) In determining whether there was such gross unfairness, we view the case as it was tried, including a review of the evidence actually introduced in the trial. (*People v. Thomas* (2012) 53 Cal.4th 771, 800-801 (*Thomas*).)

Thus, there are two steps to our analysis: (1) we look to the evidence before the trial court at the time of the ruling to determine whether the defendant made a clear showing of a substantial danger of prejudice, and weigh the potential prejudice against the state's strong interest in the efficiency of a joint trial to determine whether the trial court abused its discretion; and (2) if the trial court did not abuse its discretion based upon the evidence before it at the time of the ruling, we look to whether the defendant has demonstrated that the joinder resulted in "gross unfairness" amounting to a due process violation based on the trial evidence and other trial related matters, such as the prosecutor's closing argument.

## 2. Abuse of Discretion Contention

### a. Cross-admissibility

On appeal, defendant argues that the evidence of his involvement in the attack on the inmate was weak and that evidence of the gassing incident would not have been admissible in a separate trial of the counts related to the attack of the inmate. As noted, the prosecutor contended in the trial court that there was common motive because both

16

assaults were gang related, impliedly contending there was cross-admissibility. However, on appeal, the People concede that there was no cross-admissibility.[8] Notwithstanding this concession, cross-admissibility is only one factor in our analysis. Indeed, section 954.1 provides that in cases in which two or more different offenses of the same class of crimes have been charged together, "evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." This provision "signifies that 'notwithstanding section 954, a trial court may not *grant* severance, where the statutory requirements for joinder are met, solely on the ground that evidence in the joined cases is *not* cross-admissible.' "[9] (*Alcala, supra*, 43 Cal.4th at p. 1217, fn. 10.)

---

[8] We note that the only indication in the record that defendant's motive for the gassing may have been gang related was Sergeant Navarro's testimony that he discovered after the incident that the inmate seated next to defendant was in a rival gang. However, Sergeant Navarro did not opine that this was the basis for defendant's refusal to sit down. Moreover, no witness to the gassing incident testified that defendant complained about being seated next to this inmate. Rather, Sergeant Navarro, Officer Casillas, Officer Prum, and defendant all testified that defendant would not sit down because he did not want to be shackled to the bench in a particular manner.

[9] Defendant relies heavily on *Williams v. Superior Court* (1984) 36 Cal.3d 441 and asserts that *Williams* stands for the proposition that cross-admissibility under Evidence Code section 1101, subdivision (b), is the "first and *most important step* of the prejudice analysis." (Italics added.) Under *Williams*, the initial step in a severance motion was to determine whether evidence in one case would be admissible in the other. (*Id*. at p. 448.) Subsequently, in 1990 as part of Proposition 115, the voters added section 30, subdivision (a), to article 1 of the California Constitution, which provides, "This Constitution shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature or by the people through the initiative process." In addition to the constitutional provision, the voters added section 954.1. Following the electorate's enactment of section 954.1, much of the cross-admissibility analysis in *Williams* carries diminished persuasiveness. Proposition 115 "specifically limit[ed] the treatment of cross-admissibility of evidence as a primary factor for determining prejudice as set forth in *Williams*." (*Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1286 (*Belton*).)

Accordingly, "even if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion." (*People v. Geier* (2007) 41 Cal.4th 555, 577, overruled on other grounds in *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 [174 L.Ed.2d 314].) While the evidence would not have been cross-admissible in separate trials here, we are not persuaded that any other factor supports defendant's contention that the trial court abused its discretion.

### b. Likelihood of Inflaming the Jury

As noted, one prejudice consideration is whether some of the charges were likely to inflame the jury against the defendant. (*Soper, supra*, 45 Cal.4th at p. 775.) We do not consider the gassing charges likely, or more likely than the inmate assault charges, to inflame the jury against him. The gassing incident evidence paled in comparison to the evidence of the inmate attack, which was gang orchestrated, callous, bloody, and inflicted serious and potentially grave injuries. Thus, there was little likelihood that the joinder of the gassing incident charges would inflame the jury in its decision on the inmate assault charges.

Defendant contends that the prosecutor used defendant's testimonial admissions that he was a gang member and that he spit at the correctional officer to inflame the jury, asserting that comments made by the prosecutor during closing argument were "intended to be highly prejudicial and inflammatory."[10] In other words, the prosecutor's comments

---

[10] Defendant complains about the following comments made by the prosecutor: "Testimony of the defendant. Admits he's a Yuba City Norteño. Admits he assaulted and spit on Officer Casillas merely and solely because he got upset because the correctional officers wouldn't do what he wanted them to do. That's it regarding that. According to him, shame on them for making him mad. Even he points out that when they were done and shackled him, they all stepped back and walked away. At which point he told Officer Casillas and the others, 'Fuck you, bitches,' and he spit on them." The prosecutor further

18

about the gassing incident inflamed the jury and he would not have been able to make these comments in a separate trial involving the assault on the inmate. According to defendant, a jury exposed to these comments was much more likely to convict defendant of the charges related to the inmate assault regardless of the evidence.

Defendant's argument fails to recognize that our review for abuse of discretion is limited to the facts before the court at the time of the ruling. (*Merriman, supra*, 60 Cal.4th at p. 46; *Soper, supra*, 45 Cal.4th at p. 783; *Mendoza, supra*, 24 Cal.4th at p. 161.) We do not factor into that analysis what the defendant said during his testimony. A defendant cannot create an abuse of discretion for refusal to sever charges at the beginning of the trial based on testimony the defendant gives later in the trial. Nor do we consider what the prosecutor said during his closing argument at the end of the trial in deciding whether the trial court abused its discretion at the beginning of the trial by denying defendant's severance motion.

### c. Joining a Purportedly Weak Case with a Strong Case

We next consider whether a weak case was joined with a strong case so that the totality of the evidence could have altered the outcome as to some or all of the charges. (*Soper, supra*, 45 Cal.4th at p. 775.) In order to demonstrate the potential for a prejudicial spill-over effect, defendant must show an "extreme disparity" in the strength or inflammatory character of the evidence. (*Belton, supra*, 19 Cal.App.4th at p. 1284.)

Again, defendant relies on evidence that came out during the trial in contending the trial court abused its discretion. He argues that because he admitted gassing the correctional officer in his trial testimony but did not admit to the assault on the inmate, the evidence of the gassing was stronger because his identity was at issue in the inmate

---

argued, "The defendant admits he's guilty of being a gang member, admits he's guilty of the assault on Officer Casillas. Admits he's guilty to the gassing on Officer Casillas. He's also guilty of recruiting his own brother, little brother into a violent, vicious gang. It's not on the charging document, but that's just morally disgusting . . . ."

19

assault. Further, he claims that the evidence related to the attack on the inmate was weak because it relied on the testimony of accomplices and he discounts the corroborating DNA evidence as well as Sergeant Johnson's identification from the surveillance video of the attack. We are not persuaded.

At the time of the severance motion, defendant had pleaded not guilty to the gassing charges and it was not clear that he would admit that he spit on Officer Casillas. Indeed, in making the severance motion, the defense never referenced any specific testimony it expected would be introduced, either in his written motion or in the oral argument at the hearing on the motion. As we have already noted, we review for abuse of discretion based on the facts before the court at the time of the ruling.

Moreover, as in *Soper*, "the salient point" in our weighing the relevant strength and weaknesses of the evidence here "is that the proffered evidence was sufficiently strong in both cases." (*Soper, supra*, 45 Cal.4th at p. 781.) It is "always . . . possible to point to individual aspects of one case and argue that one is stronger than the other." (*Ibid.*) "A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Ibid.*) "Furthermore, the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried." (*Ibid.*) There must be an "extreme disparity" in the strength of the evidence. (*Belton, supra*, 19 Cal.App.4th at p. 1284.) Here, we conclude that the strength of the evidence as to each incident was relatively balanced.

In arguing that the evidence in the inmate assault case is weak, defendant discounts the DNA evidence and the eyewitness identification evidence. He says the DNA evidence did not establish his guilt beyond a reasonable doubt because it was Leal who used the stabbing weapon on which defendant's DNA was found and the presence of

defendant's DNA on that weapon could be explained by the fact that defendant and Leal shared a cell. Although the DNA evidence alone did not establish defendant's guilt beyond a reasonable doubt, it nevertheless strengthened the prosecution's case.

Defendant derides the eyewitness identifications because they were made by accomplices and Sergeant Johnson, who defendant claims was biased. But the fact of the matter is that defendant was identified as the initial hitter by three different people, including Sergeant Johnson, defendant was a possible contributor of DNA on the handle of the weapon used by his cellmate in the assault, he and his cellmate were Norteño gang members, and the assault on the inmate had the earmarks of a Norteño removal hit. We detect no real imbalance in the strength of the evidence, but if there was any, it certainly does not indicate a risk of prejudicial spillover effect. Moreover, the evidence related to the gassing charges and the evidence related to the inmate assault charges were sufficiently distinct "as to render the likelihood of prejudice minimal." (*Mendoza, supra*, 24 Cal.4th at p. 162.) In light of these factors, there was little likelihood that the jury would be improperly influenced by evidence of one incident in determining defendant's guilt as to the other.

### d. The State's Interest in a Joint Trial

The state's interests in a joint trial include efficiencies in both the trial court and appellate court. (*Soper, supra*, 45 Cal.4th at pp. 781-782.) We need not discuss those interests in detail here or engage in a balancing of those interests, because we conclude defendant has failed to show any prejudice to balance against those interests.

### e. Conclusion - Abuse of Discretion

After considering the above facts, we conclude that defendant has failed to carry his burden of making the " 'clear showing of prejudice' " required to establish that the trial court abused its discretion in denying his severance motion. (*Soper, supra*, 45 Cal.4th at p. 783; *Alcala, supra*, 43 Cal.4th at p. 1229.)

21

### 3. Due Process Contention

As noted earlier, our analysis does not end with the question of whether the trial court abused its discretion in denying the severance motion. Where a trial court's severance ruling is correct at the time it was made, a reviewing court " 'still must determine whether, in the end, the joinder of counts . . . for trial resulted in gross unfairness depriving the defendant of due process of law.' " (*Soper, supra*, 45 Cal.4th at p. 783.) Defendant has the burden to establish gross unfairness, a burden our Supreme Court has characterized as a "high burden." (*Ibid*.) To establish gross unfairness amounting to a due process violation, a defendant must demonstrate a "reasonable probability" that the joinder affected the jury's verdicts. (*Merriman, supra*, 60 Cal.4th at p. 49; *People v. Grant* (2003) 113 Cal.App.4th 579, 588 (*Grant*).)

As we have mentioned, defendant complained that his identity was in issue in the inmate assault, and he was prejudiced by the evidence concerning the gassing of the correctional officer because he admitted in his testimony that he was a gang member and that he spit in the correctional officer's face. In connection with our abuse of discretion analysis, we have already noted that defendant cannot create reversible error by his testimony. In a due process analysis, we consider what transpired during the trial, after the trial court's ruling on the severance motion, to determine whether a defendant has shown "gross unfairness." (*Thomas, supra*, 53 Cal.4th at pp. 800-801.) However, we hold that a defendant cannot create a due process violation from a trial court's refusal to sever before trial based on testimony he gives later during trial -- at least where the defendant provided no information to the trial court about his prospective testimony prior to the court's ruling. To hold otherwise would allow defendants to cause a due process error with their own testimony and then cry foul on appeal. Case law concluding joinder resulted in "gross unfairness" demonstrates that something else is required to show a due process error in this context.

22

For example, in *Grant, supra*, 113 Cal.App.4th 579, the court found that the convergence of multiple factors resulted in a denial of due process: the evidence was not otherwise cross-admissible, the evidence on one count was particularly weak, the evidence on both counts was similar rather than distinct (but not similar enough for Evid. Code, § 1101, subd. (b)), the court denied defendant's motion for an instruction on the non-cross-admissibility of the evidence, and the prosecutor exploited these factors by expressly "urg[ing] the jury to draw the impermissible inference that, because defendant possessed stolen computer equipment (count 2), he burgled the school for computer equipment (count 1)." (*Grant*, at p. 588.)

Similarly, in another case involving a "gross unfairness" analysis, *People v. Earle* (2009) 172 Cal.App.4th 372, 409-411 (*Earle*), the court held that the joinder of an indecent exposure charge with a sexual assault charge resulted in a due process violation. The identity evidence was far less compelling in the sexual assault case. Moreover, the prosecutor relied heavily on the indecent exposure evidence to encourage the jury to infer that if defendant was guilty of that crime, he was guilty on the sexual assault charge. The court observed, "It is no exaggeration to say that [the prosecutor] mentioned the indecent exposure at every opportunity, on every conceivable pretext, and for every possible purpose." (*Earle*, at p. 409.) The defense objected to the prosecutor's argument, but the trial court overruled the objection, saying that the jury could give the prosecutor's argument " '*whatever weight they want*.' " (*Id.* at pp. 410-411.) The court held that due to the prosecutor's comments and the significantly stronger evidence on the indecent exposure charge, the denial of the motion to sever resulted in "gross unfairness." (*Id.* at p. 411.)

In this case, defendant complains that comments the prosecutor made during closing argument about the gassing incident, which he describes as "highly prejudicial," could not have been made to a jury in a separate trial on the inmate assault incident and that these comments inflamed the jury. (See fn. 10, *ante*.) According to defendant, these

23

comments made the jury more likely to convict defendant on the inmate assault charges regardless of the evidence. Yet the record reflects no objection to these supposed intentional "highly prejudicial and inflammatory" comments. Moreover, the prosecutor's comments were made during his argument about the gassing incident. Unlike the impermissible inferences the prosecutors argued in *Grant* and *Earle*, the prosecutor in this case did not urge the jury to draw an impermissible inference that because defendant spit at the correctional officer, he must have assaulted the inmate as well, or that he was otherwise predisposed to do so. Indeed, the prosecutor made no connection in his argument on the correctional officer gassing to the inmate assault and did not otherwise seize upon defendant's testimony confessing to the gassing to bolster his case against defendant in the inmate assault. In further contrast with *Grant* and *Earle*, as we have already discussed, here we are not presented with a situation where a weak case was joined with a strong case.

In determining whether there was gross unfairness, we may also look to the verdicts here. Because the jury found defendant not guilty of two of the charges related to the inmate assault, those verdicts tend to show that the jury considered the evidence separately and was not prejudiced by the evidence or argument related to the gassing incident.

As for the admission defendant made about being a Norteño gang member during his testimony, this circumstance is inconsequential. Evidence that defendant was a Norteño gang member came out in the accomplice testimony, the jail classification officer's testimony,[11] testimony about defendant's tattoos, Sergeant Johnson's testimony, and defendant's own testimony unrelated to the gassing incident. Thus, the jury would

---

[11] Defendant did not object to the testimony concerning his gang membership admissions to the jail classification officer in the trial court; nor did he assert the admission of this testimony as a ground for appeal.

have heard about his gang membership (a factual matter that could not have been seriously disputed) even if the charges related to the gassing had been severed. Assuming his admission that he spit at the correctional officer and the fact that he did not admit to involvement in the inmate assault incident should be considered in our due process analysis, we fail to see how his admission and denial created "gross unfairness" and defendant does not explain how it does.

Considering the trial evidence and other pertinent matters related to the trial, defendant has failed to show a "reasonable probability that the joinder affected the jury's verdicts." (*Grant, supra*, 113 Cal.App.4th at p. 588; *Merriman, supra*, 60 Cal.4th at p. 49.) Thus, we conclude the defendant has failed to show gross unfairness.

### 4. Conclusion - Severance Contention

Defendant has failed to show that the trial court abused its discretion in denying his severance motion. Furthermore, the trial court's ruling did not result in gross unfairness such that defendant was deprived of due process.

### II. Corroboration of Accomplice Testimony

### A. Additional Background and Defendant's Contentions

Following the People's presentation of evidence, defense counsel moved to dismiss counts one through four on the ground that there was insufficient evidence to corroborate the testimony of the two accomplices, Henderson and Amaya. (3 RT 762) The trial court reasoned that, similar to the corroboration in *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1178 (*Samaniego*), "what we do have here is [Sergeant] Johnson's testimony. And . . . you can attack this for all you want to, the weight of it, but he has told us that he was familiar with the defendant's appearance, the way he carried himself, the shape of his shoulders, the way he carried his shoulders, and so forth. His height and stature, just as in [*Samaniego*], and that from the videotape, he's able to identify him." The court denied the motion, ruling that this witness identification together with the DNA

25

evidence connecting defendant to one of the weapons was sufficient evidence to corroborate the accomplice testimony.

In his new trial motion, defendant again argued that there was insufficient evidence to corroborate the testimony of the two accomplices. The trial court noted that while Sergeant Johnson's testimony alone may not have been enough to convict defendant, corroborating evidence need only be slight. Accordingly, the court denied defendant's motion for a new trial.

Defendant renews this argument on appeal, asserting that the trial court erred in denying his motion for a new trial because there was insufficient evidence to corroborate the accomplice testimony and thus, there was evidence to support the verdicts on counts two, four, and five. We disagree.

## B. Analysis

Section 1111 prohibits a conviction based "upon the testimony of an accomplice unless it [is] corroborated by such other evidence as shall *tend to connect* the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111, italics added; *People v. Hillhouse* (2002) 27 Cal.4th 469, 492; *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128-1130.) "To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that '*tends to connect* the defendant with the crime charged' without aid or assistance from the accomplice's testimony. [Citation.] Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime. [Citations.] ' "[T]he *corroborative evidence may be slight and entitled to little consideration when standing alone*." ' " (*People v. Avila* (2006) 38 Cal.4th 491, 562-563, italics added (*Avila*).) Corroborating evidence "must do more than raise a

conjecture or suspicion of guilt, however grave. [Citations.] On the other hand, unless a reviewing court determines that the corroborating evidence should not have been admitted or that it could not reasonably tend to connect a defendant with the commission of a crime, the finding of the trier of fact on the issue of corroboration may not be disturbed on appeal." (*People v. Falconer* (1988) 201 Cal.App.3d 1540, 1543.)

In this case, the trial court instructed the jury that both Henderson and Amaya were accomplices as a matter of law. Accordingly, for the jury to rely on their trial testimony about the attack of the inmate, it had to conclude that evidence independent of their testimony tended to connect defendant to those crimes. (§ 1111; *People v. Davis* (2005) 36 Cal.4th 510, 543 (*Davis*).)

The evidence available to corroborate the accomplices' testimony about defendant's involvement in the attack on the inmate was as follows: (1) DNA on one of the weapons; (2) Sergeant Johnson's testimony identifying defendant as the first hitter by his appearance and walk; and (3) defendant's gang membership and association with the other people involved in the assault. This evidence sufficiently " ' "tends to connect the defendant with the commission of the offense in such a way as reasonably may satisfy a jury that the accomplice is telling the truth . . . ." ' " (*Davis, supra*, 36 Cal.4th at p. 543.)

Defendant contends that because the DNA was found on the handle of the stabbing weapon rather than the slashing weapon that the accomplices testified defendant used, the DNA evidence does not corroborate their testimony. However, corroborating evidence need not corroborate an accomplice in every fact to which the accomplice testifies. (*Davis, supra*, 36 Cal.4th at p. 543; *Samaniego, supra*, 172 Cal.App.4th at pp. 1177-1178.) Defendant further contends that because the jury found him not guilty of possessing the stabbing weapon as charged in count three, possession of a deadly weapon

27

by a prisoner, the DNA evidence could not corroborate the two accomplices.[12] However, "[c]orroborating evidence need not be sufficient to establish the defendant's guilt." (*Samaniego*, at pp. 1177-1178.)

Defendant suggests that the DNA evidence is weak and inconclusive. To be sure, the criminalist did not testify that the DNA found on the handle of the stabbing instrument was defendant's DNA. She testified that defendant was a "possible" major contributor of that DNA. She also testified that Leal, defendant's cellmate, was a possible major contributor to DNA found on the handle of that weapon as well, but none of the other people who provided samples could be included as contributors. Although not conclusive, the DNA evidence nevertheless tended to connect defendant to the assault on the inmate. And as we have noted, corroborating evidence is sufficient even if it is " ' "slight and entitled to little consideration when standing alone." ' " (*Avila, supra*, 38 Cal.4th at p. 563.) Thus, contrary to defendant's view of the DNA evidence, that evidence is sufficient to corroborate accomplice testimony.

Additionally, a non-accomplice witness, Sergeant Johnson, identified defendant as the first hitter from his review of the video recording. Defendant asserts that Sergeant Johnson was biased because he had a motive to corroborate the accomplice witnesses and

---

[12] There was inconsistency in the charging allegations as to the weapon defendant was alleged to have used. The information alleged that the deadly weapon defendant used in the personal use enhancement for count one (attempted murder) was "razor blades," but the deadly weapon he used in count two (assault with a deadly weapon) and the associated personal use enhancement was a "knife." However, neither the instructions nor the verdict forms for either count or the associated personal use allegation described the nature of the deadly weapon. As for count four (assault by a prisoner with a deadly weapon), the information, instruction and verdict form did not specify the nature of the weapon. As for count three (possession of a deadly weapon by a prisoner), while the verdict form did not indicate the nature of the weapon, the information and the instruction specifically identified the weapon defendant was alleged to have possessed as a "knife" and referenced the requirement that "defendant knew" the object could be used " 'as a stabbing weapon.' "

his bias was evidenced in his statement to defendant's brother that defendant would not be coming home. Yet, any evidence of bias goes only to the weight of the testimony and as we have noted, the weight need only be slight. Sergeant Johnson identified defendant in the video from his observation of defendant's manner of carrying himself, his walk, his high broad shoulders, as well as his size, height, and baldness. Defendant derides this identification and asserts it "suffers from the infirmity inherent in all eyewitness evidence."

In our view, this is not the typical eyewitness identification where a person sees a suspect during the commission of a crime, perhaps only briefly, and does not have the opportunity to play that scene over again. Here, the identification was made from a video recording. Moreover, Sergeant Johnson's testimony was actually stronger than the testimony of the non-accomplice witness in *Samaniego*, which the trial court referenced in its ruling. That witness's testimony was found to be sufficient corroboration even though the witness only testified that he " 'believed' " Samaniego was the third person in front of the victim's apartment at the time the victim was murdered based upon the way he stood, his stature, and his body form. (*Samaniego, supra*, 172 Cal.App.4th at p. 1178.) The witness also admitted he was not sure if Samaniego was, in fact, the third person and he further said he had no idea who the third person was. The *Samaniego* court held that while this testimony rendered the corroboration slight, that testimony along with gang association evidence was sufficient to corroborate the accomplice's testimony. (*Ibid.*) Here, unlike the equivocal identification in *Samaniego*, Sergeant Johnson was confident of his identification and not only offered reasons why he identified defendant, but said he had seen defendant ten to twenty times before.

Also similar to *Samaniego*, further corroboration exists here in the evidence of defendant's Norteño gang membership and his association with others involved in the inmate assault. Those circumstances tended to show that defendant had a motive to participate in the inmate assault, as did the other individuals who were involved. (See

*Samaniego*, *supra*, 172 Cal.App.4th at p. 1172 [reasoning that "[g]ang membership can be a significant factor in corroborating an accomplice's testimony" because it tends to show motive and opportunity]; see also *People v. Szeto* (1981) 29 Cal.3d 20, 28 [same].) Here, there was independent evidence that defendant was an active Norteño based on Sergeant Johnson's testimony, defendant's tattoos, and defendant's own gang affiliation admissions. He shared a cell with the other "hitter" in the assault, an attack that had the earmarks of a typical Norteño removal. For these reasons, we conclude that there was sufficient corroborating evidence tending to connect defendant with the commission of the crime independent of the accomplice testimony. Accordingly, the trial court did not err in denying defendant's motion for a new trial.

## DISPOSITION

The judgment is affirmed.


                                                 MURRAY        , J.


We concur:


     NICHOLSON    , Acting P. J.


     MAURO       , J.