Filed 1/16/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>DAVONTE STINSON,<br><br>    Defendant and Appellant. | C077621<br><br>(Super. Ct. No. 13F04902) |

APPEAL from a judgment of the Superior Court of Sacramento County, Marjorie Koller, Judge. Affirmed as modified.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of Parts I., II., IV., and V. of the Discussion.

1

Defendant and codefendant[1] approached S.A. in his parked car and, at gunpoint, took several items from him including his wallet, keys, and cell phone. Still at gunpoint, they made S.A. move from the driver's seat to the trunk, placed him in the trunk and closed it, and then continued to look through the car. Defendant and codefendant then fled, leaving S.A. in the trunk. Shortly thereafter, using S.A.'s keys, defendant and codefendant entered the apartment S.A. shared with his fiancé, A.L.G., and her two children. At gunpoint, they demanded that A.L.G. give them whatever guns and money that were in the apartment. After obtaining two guns and other items, they left.

Defendant and codefendant were tried together. The jury found defendant guilty of kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1); count one (victim—S.A.)),[2] robbery in the second degree (§ 211; count two (victim—S.A.)), possession of a firearm by a felon (§ 29800, subd. (a)(1); counts three & five), and robbery in the first degree (§ 211; count four (victim—A.L.G.)). The jury also found true vicarious arming enhancements for being a principal in the commission of the counts of kidnapping for robbery and second degree robbery where one of the principals was armed with a firearm (§ 12022, subd. (a)(1)), and an enhancement for personal use of a firearm on the first degree robbery count (§ 12022.53, subd. (b)). The court sentenced defendant to seven years to life, plus a determinate term of 17 years eight months.

On appeal, defendant asserts that: (1) the trial court abused its discretion in denying the defense motion to sever count six, charging only codefendant with being a felon in possession of a firearm (§ 29800, subd. (a)(1)) based on the discovery of a handgun in codefendant's backpack approximately three months after the robberies of S.A. and A.L.G; (2) the evidence was legally insufficient to support the conviction of

---

[1] The codefendant, Dontae LaRail McFadden, is not a party to this appeal.

[2] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

2

kidnapping to commit robbery because it failed to establish that the movement of S.A. from the driver's seat to the trunk of his car was more than incidental to the commission of the robbery and that it increased the risk of harm to S.A.; and (3) the court erred in the manner in which it modified CALCRIM No. 1203. In supplemental briefing, defendant asserts that: (4) he is entitled to remand for a *Franklin*[3] hearing, and (5) remand is also required for the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (b), firearm use enhancement following the passage of Senate Bill No. 620.

In the published portion of this opinion, we conclude that the trial court did not err in instructing the jury with the modified version of CALCRIM No. 1203. In the unpublished portions of this opinion, we conclude that the trial court did not abuse its discretion in denying the defense motion to sever; nor were defendant's due process and fair trial rights violated by the joinder. We also conclude that the evidence was legally sufficient to support the conviction of kidnapping to commit robbery. Finding merit to the contentions raised by defendant in his supplemental briefing, we remand the matter to the trial court for a *Franklin* hearing and for the trial court to exercise its discretion under section 12022.53, subdivision (h), to consider whether to strike the section 12022.53, subdivision (b), enhancement. We otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

#### The People's Case

S.A. testified that, on May 13, 2013, he went out to run some errands. He then decided to go to an apartment complex to see if a friend wanted to play basketball. S.A. parked his silver Dodge Charger at the apartment complex and reached for his phone to call his friend. Before S.A. could place the call, he saw an individual next to his car door.

---

[3] *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*).

3

S.A. identified defendant at trial as that individual. Defendant said, "[W]hat's up, Bro, you know what time it is." Then codefendant, who S.A. also identified at trial, opened the front passenger door and entered S.A.'s car. Codefendant pointed a gun at S.A.'s head and told him not to move or he would shoot.

The description of the gun wielded by codefendant is at the heart of the severance issue. S.A. testified that the gun was a black semiautomatic with "a little silver on the top." S.A. also testified that "it wasn't that much silver. It had just a little piece of silver in it."

Both defendant and codefendant began to pat down S.A.'s pants and one of them removed S.A.'s wallet containing his California driver's license bearing an old address, his Social Security card, a medical card bearing his current address, a debit card, and cash. Codefendant then snatched the keys from the ignition of S.A.'s car and also grabbed S.A.'s phone.

Defendant and codefendant ordered S.A. to get out of the car. Defendant grabbed S.A.'s hands and pulled him out. At that time, S.A. observed an individual nearby with whom he was familiar. Defendant chased that individual off while codefendant stayed near S.A. with the gun pointed at him. S.A. testified that defendant had no difficulty moving around, standing, or leaning over, and he was not limping. Nor did he notice codefendant having any difficulty moving around. After chasing the individual away, defendant returned to S.A. and "got in [his] face again."

Defendant opened the trunk. Codefendant continued to point the gun at S.A.'s head, and defendant and codefendant told S.A. to get into the trunk. S.A. was moved six to eight feet to the trunk with codefendant's gun still pointed at his head. While being moved to the trunk, S.A. begged, "[D]on't do this, please don't do this." Defendant and codefendant then "shoved" S.A. into the trunk and closed it. S.A. described himself as a "big guy" and testified that it was "hard to fit" into the trunk. Because of his size, the

4

trunk lid did not close all the way and someone slammed it down on him to get it to close. However, S.A. testified that he suffered no injury during the incident.

Deon Hopkins drove into the complex's parking lot and saw what he thought was someone digging around in the trunk of a gray Charger, perhaps "messing with some music." Hopkins then thought he saw the person get into the trunk of the Charger. He asked his cousin, Marvin Hollis, who was in the car with him, if he saw the same thing, but Hollis had not noticed it.

While in the trunk of his car, S.A. could hear defendant and codefendant "going through the car." He "heard stuff moving, doors opening, my dash opening, my arm rest opening, just . . . heard them going through the car." This lasted for five to ten minutes. During this time, S.A. was scared. He did not know what was going to happen, but he thought he would probably never see his family again.

Hollis observed two individuals, a larger dark-skinned individual and a smaller light-skinned individual, standing outside of a gray Charger with its doors open. The two men then walked away from the Charger. According to Hollis, the two men were moving fast. They got into a cream-colored Lexus and drove off. Hopkins went inside the apartment complex while Hollis remained outside and smoked a cigarette.

Once S.A. no longer heard any noise outside, he pulled the emergency release lever in the trunk and opened it. When S.A. saw that no one was around his car, he got out of the trunk. As Hollis finished his cigarette, approximately two minutes after the two men drove off in the Lexus, he saw S.A. climb out of the trunk of the Charger. S.A. seemed frightened. S.A. approached Hollis and asked him for help, and Hollis gave S.A. his cell phone.

S.A. called 911 to report the incident. Among other things, he told the 911 operator that the perpetrators were driving a gold Lexus. According to S.A., Hollis had told him that "the guys over here ran into the gold car and drove off." A couple of minutes later, Officer Arik Farahmand arrived, and S.A. described the incident to him.

5

Farahmand also spoke to Hopkins and Hollis. At trial, Hollis was unable to identify defendant or codefendant as the perpetrators. He explained that after a year, he no longer remembered what they looked like and in any event, he only "got a quick glance" at them.

Meanwhile, A.L.G. was with her two children at the apartment she shared with S.A. when she heard a knock on the door.[4] She answered the door and saw defendant, who, using only S.A.'s first name, asked if he was home. A.L.G. responded that he was not. She began to close the door when codefendant placed his foot against the door. One of the men then said that S.A. told him they could wait for him at home. A.L.G. had never seen defendant or codefendant before, and she was alarmed because S.A.'s friends never referred to him by his first name. A.L.G. told them "that's not [S.A.]," and told codefendant to move his foot. She then pushed the door as hard as she could, and managed to close and lock it.

After she closed the door, A.L.G. retrieved her handgun.[5] As she grabbed the handgun, she heard the sound of keys. A.L.G. recognized the sound of S.A.'s keychain. The front door then flew open. A.L.G. attempted to cock the handgun, but she was holding her four-month-old daughter and could not manage to do so. Codefendant wrested the gun away from A.L.G. and put it in his pocket. Defendant, who had a shirt concealing part of his face, came up behind A.L.G. and placed a gun to her temple. Defendant asked where the guns were. At first, A.L.G. stated that she did not have

---

[4] S.A. stated that the children were his daughter and his stepson.

[5] A.L.G. testified that she had purchased the handgun for herself and she had purchased a shotgun for S.A. She testified that there were shootings and robberies at the apartment complex over the several months prior to the incidents at issue here, and she did not feel safe, particularly when S.A. was gone and she was alone in the apartment with her children. When S.A. would go out, A.L.G. would place the handgun where she could easily retrieve it if someone attempted to come in.

6

anything and asked the men to leave. Codefendant then said something about A.L.G.'s son, which scared her, and she told the men about their other gun. Defendant walked A.L.G. to the bedroom, A.L.G. reached for a Mossburg shotgun she had, and codefendant grabbed it. The men then asked where the money was. A.L.G. responded that she only had three dollars in her wallet and she emptied the contents of her purse. The men took a couple of sweaters and a baby blanket to conceal the guns. As they moved toward the front door, defendant grabbed A.L.G.'s cell phone. A.L.G. asked to keep it because it had information on it about her son's disability as well as other important matters. Defendant stated that he was going to take the phone so that A.L.G. would not call the police, but he let A.L.G. remove the SIM card from the phone. The two men then opened the door, one of the men dropped S.A.'s keys at A.L.G.'s feet, and then they both left. As defendant was leaving, he removed the shirt that was covering his face and threw it to the ground.

Two neighbors saw two men running from A.L.G.'s apartment. Neither one noticed or recalled either man limping. They were unable to identify defendant or codefendant at trial. A.L.G. ran outside and screamed for help. A neighbor from upstairs responded and called the police.

Meanwhile, approximately two minutes after Officer Farahmand's arrival at S.A.'s location, while Farahmand was speaking with S.A., a broadcast over the officer's radio indicated that there had been a report of a home invasion robbery at S.A.'s address. S.A. asked Farahmand to take him home to see if his family was okay. As they were on their way to S.A.'s house, Farahmand had S.A. view a suspect who had been detained by police. However, the suspect was not one of the perpetrators. They then drove directly to S.A.'s apartment.

Latent fingerprints were later lifted from the Charger, 11 prints from the trunk lid and one from the passenger-side door. A latent palm print lifted from the trunk of the Charger matched defendant's palm print. A latent fingerprint from the trunk lid of the

7

Charger matched codefendant's left middle fingerprint. Another latent fingerprint from the trunk lid of the Charger matched a third person. S.A. testified he had a friend who had the same name as this third person. The fingerprint expert testified that a fingerprint could remain on a surface indefinitely and that there was no way of determining how long a particular print had been on a surface.

Detective Christina Mortenson was informed of the names of the three individuals whose fingerprints were discovered on the Charger. Mortenson prepared two photographic lineups with defendant in one and codefendant in another, along with "fillers," who were of similar in age and appearance to defendant and codefendant.[6]

On July 18, 2013, Mortenson had S.A. view the two photo lineups. In one, S.A. identified defendant as the man who had stood next to him at the driver's-side door. S.A. was sure of his identification of defendant. Indeed, according to Mortenson, S.A. immediately pointed to defendant's photograph, and stated, "I can't forget that face." He said he was "300 percent sure that was him." In another photo lineup, S.A. identified codefendant as the man who had been at the passenger-side door holding the gun.

On the same date, Mortenson showed A.L.G. two photo lineups. In the photo lineup in which defendant appeared, A.L.G. narrowed the possibilities down to two, defendant and one other, but could not be sure which of the two was one of the perpetrators. A.L.G. was also not sure of an identification in the photo lineup in which codefendant appeared.

On August 20, 2013, Officer Alvaro Sanchez responded to the location of a vehicle stop where codefendant was in custody. Sanchez then went to the premises

---

[6] On cross-examination, Mortenson acknowledged that she did not prepare a photo lineup using a photograph of the third person's whose print was found on the Charger. Nor did she conduct an in-person lineup including that third person. She also acknowledged that she had never spoken with that person in connection with this case. That person was a 43-year-old black male.

where codefendant indicated he had been staying. Codefendant's grandmother stated that there was a backpack belonging to codefendant in her bedroom. Sanchez obtained the backpack and looked through it. In the backpack, Sanchez found mail to codefendant and a loaded handgun. The handgun was a black and silver Smith & Wesson nine millimeter. However, when S.A. was shown this handgun at trial, he testified that it was not the handgun used by the perpetrators who robbed him on May 13, 2013.

On January 23, 2014, defendant was arrested in Louisiana on an arrest warrant.

As noted, S.A. identified defendant and the codefendant in photo lineups and again at trial. S.A. testified that, prior to the incident on March 13, 2013, he had never met defendant or codefendant. S.A. acknowledged describing defendant to the police as light-skinned in his early twenties, approximately five foot eleven inches, weighing 130 to 140 pounds, wearing a white tank top and blue shorts. S.A. also noticed a tattoo on defendant's face,[7] but did not notice other tattoos. S.A. described codefendant as dark-skinned, approximately six foot one inch or six foot two inches, almost 300 pounds, in his late twenties, wearing a white T-shirt. On cross-examination, S.A. acknowledged that, in prior testimony, he had estimated that codefendant weighed approximately 200 pounds.

S.A. testified that at the time of the robbery, codefendant had short hair styled in twisties that were an inch long or shorter. A.L.G. also described one of the two perpetrators has having his hair in "twisties." She also said he had a "small beard."

A.L.G. viewed two in-person lineups, one including codefendant on August 29, 2013, the other including defendant on February 6, 2014. Regarding defendant's lineup, A.L.G. indicated that she was not certain, but she believed the person in position number two, which was defendant, was one of the perpetrators. In the lineup including codefendant, the participants were instructed to say, "Where's the guns?" A.L.G.

---

[7] S.A. testified that he did not remember what the tattoo looked like and also explained that he was not wearing his glasses at the time of the robbery.

identified codefendant. She testified that it was easier to remember and make an identification seeing the individual face-to-face, and that hearing codefendant's voice aided her in making the identification. She also recognized codefendant by the shape of his head. At trial, A.L.G. stated that she had no doubt that defendant and codefendant were the people who barged into her home and took property.

### Codefendant's Case

Codefendant's cousin, Dari Britton, testified that codefendant had a slight limp. He had been shot in his leg at least 10 years prior to trial, and he had a metal rod implanted, causing him to walk with a noticeable limp. Since he sustained that injury, Britton had never seen codefendant attempt to run.

Britton also testified that codefendant had a scar over one eye which he had sustained more than 10 years earlier. Additionally, she testified that codefendant always wore his hair as it was at trial, which was very short. She testified that she had not known codefendant in the last several years to have hair long enough to wear it in twisties, and it was not long enough to do so in May 2013. She also told a defense investigator that codefendant never had twisties or facial hair, but upon being confronted with photographs spanning from 2005 to 2013 at trial, she admitted that codefendant had had facial hair.

### Defendant's Case

Defendant testified on his own behalf. He acknowledged juvenile adjudications for battery, theft, resisting arrest, armed robbery, and first degree burglary. He also had adult convictions for evading a peace officer and two convictions for domestic violence. He testified that he knew codefendant from seeing him when they were in the same pod in jail.

Defendant denied being involved in either robbery.

In April 2013, defendant was at a gas station when a car pulled up and someone in the car fired an assault rifle. Defendant was shot in the shoulder, thigh, and buttocks, and

10

the left side of his face and hand were grazed. Defendant was released from the hospital the day after he was admitted. Defendant still had a bullet in his left shoulder and a bullet in his left buttocks.

Defendant testified that, in the weeks between April 18, 2013, and May 13, 2013, he walked with a limp and was incapable of running. For the first several weeks, he required help to get up. He was also experiencing excruciating pain. Defendant wore a sling for two or three weeks after the shooting, and he could not lift anything due to the bullet in his shoulder. He could not hold his daughter, and testified that he would have been unable to hold someone and hold a gun to a person's head in the manner described by A.L.G. On cross-examination, defendant acknowledged that his hospital records stated that he had suffered no serious injury and that he had been directed to walk four to five times a day after discharge.

Shirley Shaw, the grandmother of defendant's wife, testified that, after defendant had been shot in his shoulder, hip, and leg in April 2013, she visited him frequently and helped him around the house. Shaw testified that, in the month after defendant sustained the injury, he walked with a limp because he had been shot and was in pain. According to Shaw, defendant would "slide his leg like Frankenstein" when he walked. He was also unable to run, get into or out of a car quickly, or lift his daughter, who weighed approximately 15 pounds at the time.

At trial, defendant had tattoos from his jaw line to the bottom of his neck. He testified he got these tattoos in late March or early April of 2013. He also had tattoos on both hands and on his right forearm, which he claimed to have had since he was 15 years old. The teardrop tattoo on his face had been there since defendant was 15 or 16 years old.

Defendant testified that he knew S.A. He testified that, within two weeks of the day he was shot, he was in a parking lot waiting for Shaw, who was grocery shopping, when he called a friend to ask if he knew where defendant could obtain some marijuana.

11

Defendant's friend called him back and said, "He's in the same parking lot as you." As a result, defendant met up with S.A. who was in his car, gave him money through the window of the car, obtained marijuana from S.A., and S.A. drove away. Defendant did not recall touching the trunk of the car. Defendant had not otherwise encountered S.A. Sometime after he had been shot, codefendant called defendant to ask if he knew where he could obtain marijuana. Defendant directed codefendant to the same friend who had referred defendant to S.A.

## Verdict and Sentencing

The jury found defendant guilty of kidnapping to commit robbery, robbery in the second degree, two counts of possession of a firearm by a felon, and robbery in the first degree. The jury also found the firearm arming and use enhancements to be true.

The trial court sentenced defendant to seven years to life, plus a determinate term of 17 years eight months calculated as follows: on count one, kidnapping to commit robbery, an indeterminate term of seven years to life plus one year for the vicarious arming enhancement pursuant to section 12022, subdivision (a)(1); on count four, robbery in the first degree, six years plus 10 years for the firearm use enhancement pursuant to section 12022.53, subdivision (b); and on count five, felon in possession of a firearm, eight months. Upper terms were imposed and stayed pursuant to section 654 on counts two, robbery in the second degree, and three, felon in possession of a firearm. The term on the section 12022, subdivision (a)(1), arming enhancement on count two was also imposed and stayed pursuant to section 654.

## DISCUSSION

### I. Motion to Sever Count Six

### A. Defendant's Contentions

Defendant asserts that the trial court abused its discretion by denying the defense motion to sever count six, felon in possession of a firearm, alleged against codefendant only. While defendant acknowledges a statutory basis for joinder, he argues that the trial

12

court abused its discretion in denying the motion because there was a substantial likelihood he would be prejudiced by joinder of count six with the counts related to the robberies. Defendant asserts he had no relation to the allegation in count six and there was a danger that the jury could improperly use the allegations in and proof related to that count as propensity evidence against him. Defendant asserts that there was a "complete absence of evidence" to establish that the gun found in codefendant's backpack was the same gun used during the robberies. He further asserts that, even if the court did not abuse its discretion in denying the motion to sever, the joinder of count six with the other counts was so grossly unfair that it resulted in the denial of his rights to due process and a fair trial. Defendant emphasizes that the issue of the identity of the perpetrators was sharply contested, and he essentially asserts that the evidence that he was one of the perpetrators was weak. Defendant contends that the error in denying the motion to sever cannot be deemed harmless under any standard.

We conclude that the trial court did not abuse its discretion in denying the defense motion to sever count six. We further conclude that defendant has failed to establish that he was deprived of his rights to due process and a fair trial by the joinder of count six with the other counts.

### B. Additional Background

The trial court conducted defendant's preliminary hearing on February 13, 2014.[8] We discuss the preliminary hearing testimony only insofar as relevant to defendant's assertion that the trial court abused its discretion in denying the motion to sever count six

---

[8] The two defendants had separate preliminary hearings. Codefendant's preliminary hearing is not part of defendant's record on appeal. All references to testimony from codefendant's preliminary hearing are from references made by trial counsel during the hearing on the severance motion.

13

and to clarify the state of the evidence relevant to this matter that was before the court at the time it considered and decided the motion.

Officer Farahmand testified that, on May 13, 2013, he responded to a report of a robbery and spoke with S.A. S.A. told him that he had been parked in the back of the apartment complex when an individual approached his driver's side door and asked him the time. As S.A. looked at this individual, a heavy-set black male holding a gun entered the car through the passenger side door, pointed the gun at S.A., and told him to stay calm and get out of the car. S.A. told Farahmand that the gun was a large-caliber semiautomatic that was "all black with a little silver on top of the slide." S.A. exited the vehicle and the thinner individual searched S.A.'s pockets and took S.A.'s wallet, keys, and cell phone. The individuals then forced S.A., at gunpoint, into the trunk of his car. S.A. remained in the trunk for a period of time until he believed it would be safe to get out. He then opened the trunk using the emergency lever inside the trunk.

On August 14, 2014, codefendant filed a written motion to sever as to count six. Defendant orally joined in codefendant's motion.

Defendant and codefendant asserted that the evidence pertaining to count six and the other counts would not be cross-admissible if tried as separate cases. They further asserted that they would suffer substantial prejudice, and be deprived of a fair trial, if count six was tried with the other counts. Defendants argued that, while count six's allegation of simple firearm possession was less inflammatory than the other counts, they would be prejudiced because there was a substantial risk that the firearm possession would be improperly used as propensity evidence. Finally, they argued that the prejudice resulting from trying the counts together would outweigh any benefits to the prosecution and any economic gain to be had by doing so.

At the hearing on the motion, the prosecution opposed the motion to sever, arguing that the prejudice to each defendant if count six was tried with the remaining counts would be negligible, and would not outweigh the interests of efficiency.

14

The court referred to an "indication" that the gun discovered in codefendant's possession on August 20, 2013, was not the gun used in the other charged offenses. However, the court then stated that, "looking at the Information, there is -- it's nonspecific as to what gun or what description of gun was used." The court asked the prosecutor whether there was "any information about that." The prosecutor responded that S.A. described the gun as being a black semiautomatic, perhaps with some silver on the slide. The weapon found in codefendant's possession in August 2013 was, according to the court, "a silver and black handgun without any further description." Counsel for codefendant acknowledged that, "there's a silver and black handgun referenced in both . . . ," but asserted that, because no gun was recovered concerning the robberies, there was "no way to link the two together." Codefendant's counsel also pointed out that, at codefendant's preliminary hearing, he asked S.A. about the gun and S.A. testified that "[i]t was like . . . it was a dark color, mostly like it was black, but I couldn't tell if it had a little light tint to it, but it looked black to me." (Italics omitted.) When asked, "So the only color you saw was black," S.A. replied, "Uh-huh." (Italics omitted.)

Codefendant's counsel argued that, in the absence of cross-admissibility between the two different offense dates, there was a substantial risk that the evidence concerning the gun would be used inappropriately as inadmissible propensity evidence for the offenses that occurred on May 13, 2013. While counsel acknowledged the benefit of judicial economy, he argued that there was no nexus or compelling reason why the cases should be tried together. Counsel characterized the prejudice that would result as being "great."

Defendant's attorney noted that defendant was not involved in the allegations set forth in count six. Therefore, the gun was inadmissible against defendant, and it was not relevant as to what defendant did or did not do in May 2013. Defendant's attorney contended that defendant would suffer great prejudice in the absence of severance because the jury would conclude that, since codefendant had a gun in August, he must

15

have had a gun in May, and therefore "[t]hey must be telling the truth. [Defendant] must be guilty." (Italics omitted.) Defendant's attorney also contended that, unless he was mistaken, A.L.G. had been shown the gun discovered in August and stated that she did not think it was the one used in the robbery in which she was a victim.[9] Defendant's attorney also emphasized the manner in which a gun would be displayed at trial, and would be "given, you know, firearm treatment, which is different from other evidence, and in many respects is different from the way people handle firearms in their own personal life." Once again, counsel stated that, if the motion were denied, the gun would be coming in as evidence at defendant's trial where defendant had no connection to the August incident. Defendant's attorney argued that there would be a "spillover effect," which could result in defendant being convicted based on less evidence or less compelling evidence than would have been required if count six were not part of the trial.

The prosecutor replied that the victim's original statement, taken immediately after the incident, indicated that the gun was silver and black.

The trial court denied the defense motion to sever count six. The court stated: "Given the description of the gun from May 13th, as well as the gun that was found in August, may or may not be, that's a matter that would otherwise be for the jury to decide, but the description seems to be silver and black." The court concluded that the fact that a gun was found a couple of months after the alleged robberies was relevant. The court stated that it was for a jury to determine how probative that fact was. The court stated that it did not appear that the defendants would be substantially prejudiced by denial of the motion to sever. In this regard, the court stated that there was not a particular weakness in one of the cases which would be bolstered by the other. The court also concluded that count six was not inflammatory. Indeed, the court stated that count six

---

[9] A.L.G. would later testify that she never actually saw the gun the was put to her head. She could only say "it was a little handgun."

16

charged conduct—possession of a firearm—that was also charged as to the May 13 incidents.  The court concluded that there was no substantial prejudice involved, and there was "some relevant purpose and some cross-admissibility, given that the officers at the time that they located the weapon were, in fact, looking for [codefendant], or had found [codefendant] and made an arrest based on this case."

### C.  Standard of Review and General Severance Principles

"Section 954 governs the joinder of charges:  'An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately.' " (*People v. Johnson* (2015) 61 Cal.4th 734, 750 (*Johnson*).)

" 'Because consolidation ordinarily promotes efficiency, the law prefers it.' [Citations.]  In reviewing whether the trial court improperly denied a defendant's motion to sever, ' "we apply the familiar standard of review providing that the trial court's ruling may be reversed only if the court has abused its discretion." ' " (*Johnson, supra*, 61 Cal.4th at p. 750.)  A trial court's denial of a motion to sever properly joined charged offenses amounts to a prejudicial abuse of discretion only if that ruling " ' " ' 'falls outside the bounds of reason." ' " ' " (*Ibid.*; *People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*); *People v. Ybarra* (2016) 245 Cal.App.4th 1420, 1433 (*Ybarra*).)

"In reviewing for abuse of discretion, we do not consider evidence that later came out during the trial." (*Ybarra, supra*, 245 Cal.App.4th at p. 1433.)  Rather, "[i]n determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling.' [Citation.]  Although our assessment 'is necessarily dependent on the particular circumstances of each individual case, . . . certain criteria have emerged to

17

provide guidance in ruling upon and reviewing a motion to sever trial.' " (*Soper, supra*, 45 Cal.4th at p. 774.)

"Refusal to sever [where counts are properly joined] can be an abuse of discretion where ' " '(1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case.' " ' " (*Johnson, supra*, 61 Cal.4th at pp. 750-751.)

" 'A party seeking severance must "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." ' [Citation.] And the potential prejudice must outweigh the state's strong interest in the efficiency of a joint trial." (*Ybarra, supra*, 245 Cal.App.4th at p. 1433.) It is defendant's burden to establish that the countervailing considerations of efficiency and judicial economy are outweighed by a substantial danger of prejudice. (*Soper, supra*, 45 Cal.4th at p. 774; *Ybarra*, at p. 1433.)

### D. Analysis

As defendant correctly acknowledges, there was a statutory basis for joinder of count six with the other charges in the second amended information because count six alleged "the same class of crimes or offenses" as those alleged in counts three and five. (§ 954)

Once it is determined that the charges are properly joinable under section 954, we engage in a two-step analysis: "(1) we look to the evidence before the trial court at the time of the ruling to determine whether the defendant made *a clear showing of a substantial danger of prejudice*, and weigh the potential prejudice against the state's strong interest in the efficiency of a joint trial to determine whether the trial court abused

18

its discretion, and (2) if the trial court did not abuse its discretion based upon the evidence before it at the time of the ruling, we look to whether the defendant has demonstrated that the joinder resulted in 'gross unfairness' amounting to a due process violation based on the trial evidence and other trial related matters, such as the prosecutor's closing argument." (*Ybarra, supra*, 245 Cal.App.4th at p. 1434.)

### 1. Abuse of Discretion

#### a. Cross-admissibility

The evidence relevant to count six consisted of the black and silver Smith & Wesson nine-millimeter handgun recovered from a backpack at the residence where codefendant had been staying. At defendant's preliminary hearing, Officer Farahmand testified that S.A. described the handgun used by the perpetrators who robbed him as a large-caliber semiautomatic that was "all black with a little silver on top of the slide."

Thus, at the time of the defense motion to sever, the black and silver Smith & Wesson handgun relevant to count six was potentially relevant to the remaining counts. The admission of that handgun in connection with the other counts could have had a "tendency in reason to prove or disprove any disputed fact that [was] of consequence to the determination of the action." (Evid. Code, § 210.) Later, S.A. did testify *at trial* that the Smith & Wesson handgun relevant to count six was not the handgun used by the perpetrators who robbed him. However, this circumstance is not pertinent to our analysis of whether the trial court abused its discretion when it ruled on the severance motion. As noted, we do not look to the evidence revealed during the trial to determine whether the trial court abused its discretion in denying severance (*Ybarra, supra*, 245 Cal.App.4th at p. 1433), but rather we look only to the evidence available to the trial court at the time it made its ruling on the severance motion (*Soper, supra*, 45 Cal.4th at p. 774; *Ybarra*, at p. 1433). At the time the trial court made its severance ruling, the description of the gun given by S.A. to Farahmand was not inconsistent with the description of the gun recovered from the backpack of codefendant, who was also alleged to have participated

19

in the robberies. No evidence introduced at defendant's preliminary hearing indicated that the handgun from the backpack was not the gun used in the robberies of S.A. and A.L.G. Nor did counsel for codefendant indicate there was such evidence at codefendant's preliminary hearing. Thus, the evidence before the court at the time it ruled on the motion to sever at least allowed for the possibility that the same gun was used in the robberies as was discovered in codefendant's backpack. Accordingly, we agree with the People that the evidence in the form of the handgun relevant to count six would have been cross-admissible as to the remaining counts if there were separate trials. (*People v. Scott* (1944) 24 Cal.2d 774, 778-779 [joinder proper where possession of a particular weapon was a common and important element of each crime]; *Walker v. Superior Court* (1974) 37 Cal.App.3d 938, 942 [joinder is generally proper where a specific weapon is common to more than one crime].)

We note, however, that "cross-admissibility is only one factor in our analysis. Indeed, section 954.1 provides that in cases in which two or more different offenses of the same class of crimes have been charged together, 'evidence concerning one offense or offenses *need not be admissible* as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact.' This provision 'signifies that "notwithstanding section 954, a trial court may not *grant* severance, where the statutory requirements for joinder are met, solely on the ground that evidence in the joined cases is *not* cross-admissible." [Citation.]' Accordingly, 'even if cross-admissibility did not support consolidation of the cases, the absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion.' " (*Ybarra, supra*, 245 Cal.App.4th 1434-1435, first italics added, fn. omitted, quoting *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1217, fn. 10, & *People v. Geier* (2007) 41 Cal.4th 555, 577; see also *Johnson, supra*, 61 Cal.4th at p. 751 [a lack of cross-admissibility is not sufficient by

20

itself to show prejudice and bar joinder; but if there is cross-admissibility, prejudice is dispelled].) Thus, even if evidence before the trial court did not establish cross-admissibility, we nevertheless conclude that the remaining factors lead to the conclusion that the trial court did not abuse its discretion in denying the motion to sever.

### b. Likelihood of Inflaming the Jury

Count six was not " ' " 'unusually likely to inflame the jury against the defendant.' " ' " (*Johnson, supra*, 61 Cal.4th at pp. 750-751.) As to the nature of the conduct charged in count six, it was the same as that charged in counts three and five. Thus, the conduct charged in count six was no more inflammatory than counts three and five, and was substantially less so than the conduct charged in counts one (kidnapping to commit robbery), two (robbery in the second degree), and four (robbery in the first degree), the latter of which involved threatening young children.

### c. Joining a Purportedly Weak Case with a Strong Case

"It is 'always . . . possible to point to individual aspects of one case and argue that one is stronger than the other.' [Citation.] 'A mere imbalance in the evidence, however, will not indicate a risk of prejudicial "spillover effect," militating against the benefits of joinder and warranting severance of properly joined charges.' [Citation.] 'Furthermore, the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried.' " (*Ybarra, supra*, 245 Cal.App.4th at p. 1437, citing *Soper, supra*, 45 Cal.4th at p. 781.) "There must be an 'extreme disparity' in the strength of the evidence." (*Ybarra*, at p. 1437.) Here, we conclude that there was no disparity; rather, the evidence as to both cases was sufficiently strong to warrant joinder.

Again, we must look to the information that was before the trial court at the time the motion was made in determining the relative strength or weaknesses. (*Soper, supra*, 45 Cal.4th at p. 780 [noting that "based upon the information before the trial court at the

21

time it ruled on the severance motion, it was not clear that the evidence supporting the [one] charge was significantly weaker than that underlying the [the other] charge"].) The case against defendant on counts one through five was strong. At the preliminary hearing, Officer Farahmand testified that, when he responded to S.A.'s location on the day of the robberies, S.A. told him that, while he was in his car in the apartment complex parking lot, a thinner black male came to his driver's side door and asked him what time it was. Then a heavyset black male came to his passenger side door with a gun, got into the car, pointed the gun at S.A., and told S.A. to get out of the car. The thinner man searched S.A.'s pockets and took his wallet, keys, and cell phone. S.A. told Farahmand that his house keys were on his keychain as well as his car keys. The men forced S.A. into the trunk of his car at gunpoint, where S.A. stayed until he thought it would be safe. He then used the emergency trunk release lever to get out. S.A. described the thinner man to Farahmand as a black male in his twenties, approximately five feet 11 inches tall, weighing 130 to 140 pounds, with black hair and a fade, and wearing a white tank top and blue shorts. He described the heavier man as six feet tall with short black hair, weighing approximately 300 pounds, and wearing a white T-shirt. As S.A. and Farahmand were speaking, they heard a broadcast over the police radio about a home invasion robbery at S.A.'s address. When Farahmand responded to that address, which was less than two miles from where S.A. had been robbed, he learned that the suspects "left behind the car and house keys that they took from the victim."

Detective Mortenson testified at the preliminary hearing that she responded to the location of the home invasion for a follow-up investigation and she spoke with A.L.G. A.L.G. told Mortenson that she had been home with her children when she heard a knock on the apartment door. She opened the door a crack and saw a man who asked if S.A. was home. A.L.G. responded that he was not, and the men asked when he would be back. A.L.G. told them that S.A. would be home soon, and she began to close the door. One of the men attempted to prevent her from closing the door, but she was able to close

22

and lock it. However, A.L.G., who immediately retrieved a gun and who was also holding her three-month-old child, then heard the sound of S.A.'s keys outside. As A.L.G. walked towards the door, the two men entered. A.L.G. cocked her gun, but one of the men got the gun away from her. The other man grabbed A.L.G. from behind, put her in a choke hold, and put a gun to her head. The man who had taken A.L.G.'s gun asked where the shotgun was, and she stated that it was in the closet of the master bedroom. That man retrieved the shotgun, and asked where the money was, but A.L.G. responded that she only had $3. The man took A.L.G.'s cell phone, but she was able to get the SIM card out of it. The men then ran out of the apartment.

Mortenson testified that she met with S.A. and showed him two photo lineups. When she showed S.A. the photo lineup which contained defendant's photograph, S.A. immediately pointed to defendant and said, " 'I can't forget that face. I remember his face and that is him. I'm 300 percent sure. This is the guy that was at the driver's door. He did a lot of the talking, telling me not to move.' " Mortenson also showed S.A. a photo lineup containing codefendant's photograph, and, within five to 10 seconds, S.A. picked codefendant as the one at the passenger-side door with the gun. Mortenson also conducted two photo lineups with A.L.G. A.L.G. viewed the lineup containing defendant's photograph for a little more than two minutes. She then pointed to defendant's photograph and one other "filler" photograph as "popping out." She affirmatively ruled out the other four photographs, and stated that it was either defendant or the filler. Mortenson conducted a live lineup with A.L.G. in which codefendant was one of the subjects. She identified codefendant. Subsequently, Mortenson conducted another live lineup, in which defendant was a subject. A.L.G. said she was not sure, but she "thought [defendant] was the subject." Her degree of certainty was "50/50." Mortenson also testified that defendant's and codefendant's fingerprints were discovered on S.A.'s car.

23

As for the case regarding count six against codefendant, that case, too, was strong. The elements of the offense proscribed by section 29800, subdivision (a)(1), formerly section 12021, subdivision (a)(1), are "conviction of a felony and ownership or knowing possession, custody, or control of a firearm." (*People v. Osuna* (2014) 225 Cal.App.4th 1020, 1029, disapproved as stated in *People v Frierson* (2017) 4 Cal.5th 225, 240, fn. 8.) The parties stipulated that codefendant had been convicted of a felony. According to codefendant's motion to sever, which was made part of this record when we granted defendant's motion to augment the record to include this filing, "on August 20, 2013, Sacramento police officers arrested [codefendant] . . . . After being taken into custody, [codefendant] advised the officers that he had recently been staying with his grandmother" at a specified address. "At approximately 3:10 p.m., officers contact [codefendant's grandmother] who confirms that the [codefendant] had been living in her apartment the past two weeks. She then directs the officers to her bedroom dresser and a backpack located in her room advising that both locations are where the [defendant] keeps his belongings. Sacramento Police Detective Sanchez then searched the backpack and located a loaded silver and black handgun. The gun was then booked as evidence and [codefendant] was subsequently accused of violating . . . section 29800(A)(1)."

"[A]s in *Soper*, 'the salient point' in our weighing the relevant strength and weaknesses of the evidence here 'is that the proffered evidence was *sufficiently strong* in both cases.' " (*Ybarra, supra*, 245 Cal.App.4th at p. 1437, italics added, quoting *Soper, supra*, 45 Cal.4th at p. 781.) Here, the evidence as to count six and the remaining counts was sufficiently strong to warrant joinder. It certainly was not so weak that the jury would not follow an instruction to consider the evidence as to each count separately. (*People v. O'Malley* (2016) 62 Cal.4th 944, 969 (*O'Malley*).) Thus, we conclude there was no risk of any "spillover" effect in joining those counts based on the strengths or weaknesses of the evidence.

24

### d.  The State's Interest in a Joint Trial

The law generally favors consolidation of charges because it avoids unnecessary delay, public expense, and harassment of defendants.  (*People v. Ochoa* (1998) 19 Cal.4th 353, 409.)  The state's interests in a joint trial include efficiencies in both the trial court and appellate court.  (*Soper, supra*, 45 Cal.4th at pp. 781-782 [itemizing the various costs and efficiencies at trial and on appeal].)  Those "important systematic economies" were promoted by the joinder here.  (*Id*. at p. 782.)  As our high court has noted in rejecting a severance of counts claim, "California's trial courts in particular face ever-increasing civil and criminal dockets without any guarantee of corresponding, additional funds for court services—judges, judicial staff, and clerk's office personnel—to meet the demand.  Today, no less than in the past, the opportunity for joinder with its attendant efficiencies provided by section 954 is integral to the operation of our public court system.  Manifestly, severance of properly joined charges denies the state the substantial benefits of efficiency and conservation of resources otherwise afforded by section 954."  (*Soper*, at p. 782.)  Defendant has not established that the "countervailing considerations" of efficiency and economy of judicial resources are outweighed by a substantial danger of undue prejudice.  (*Id*. at pp. 774, 782; *Ybarra, supra*, 245 Cal.App.4th at p. 1433.)

### e.  Abuse of Discretion—Conclusion

After considering the above circumstances, we conclude that defendant has failed to carry his burden of making the "clear showing of prejudice" required to establish that the trial court abused its discretion in denying his severance motion.  (*Johnson, supra*, 61 Cal.4th at p. 750; *Soper, supra*, 45 Cal.4th at p. 783; *Ybarra, supra*, 245 Cal.App.4th at p. 1438.)  The trial court's ruling was not outside the bounds of reason.  (*Johnson*, at p. 750.)

### 2.  Due Process

We next address the second prong of a reviewing court's analysis of a trial court's refusal to grant a severance motion:  "whether the defendant has demonstrated that the

25

joinder resulted in 'gross unfairness' amounting to a due process violation based on the trial evidence and other trial related matters, such as the prosecutor's closing argument." (*Ybarra, supra*, 245 Cal.App.4th at p. 1434.)

The People assert defendant has forfeited his *federal* due process claim by not raising it in the trial court, but seem to concede his *state* due process claim is preserved. In support of their forfeiture contention, they cite a case involving denial of severance of a codefendant and the failure to cite as grounds for severance in the trial court a purportedly exculpatory statement made by the murder victim to a witness that was excluded, but would have been allowed at a separate trial. (*People v. Tafoya* (2007) 42 Cal.4th 147, 162-163.) Because that case involved severance of a defendant and a specific evidentiary theory not advanced in the trial court that warranted a separate trial, it is inapposite to this case involving severance of counts.

A due process claim is built into an objection concerning severance of counts and can only be analyzed after the evidence comes in, counsel have argued their cases to the jury, and the jury is instructed. This is because a due process claim related to the failure to sever counts must based on developments that take place during the trial. "Where a trial court's severance ruling is correct at the time it was made, a reviewing court ' "still must determine whether, in the end, the joinder of counts . . . for trial resulted in gross unfairness depriving the defendant of due process of law." ' " (*Ybarra, supra*, 245 Cal.App.4th at p. 1438; accord, *Soper, supra*, 45 Cal.4th at p. 783.) This determination is made based on "events *after* the court's [severance] ruling." (*People v. Merriman* (2014) 60 Cal.4th 1, 46 (*Merriman*); see also *Ybarra*, at p. 1434.)

Defendant has the burden to establish gross unfairness, a burden our Supreme Court has characterized as a "high burden." (*O'Malley, supra*, 62 Cal.4th at p. 970; *Soper, supra*, 45 Cal.4th at p. 783; *Ybarra, supra*, 245 Cal.App.4th at p. 1438.) To establish gross unfairness amounting to a due process violation, a defendant must

demonstrate a "reasonable probability" that the joinder affected the jury's verdicts. (*Merriman, supra*, 60 Cal.4th at p. 49; *Ybarra*, at p. 1438.)

Defendant acknowledges the standard applicable to a due process claim in the context of severance of counts is " 'gross unfairness . . . depriv[ing] the defendant of a fair trial or due process of law,' " but then asserts we must apply the beyond a reasonable doubt standard in *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711]. He cites *Chapman* and *Sullivan v. Louisiana* (1993) 508 U.S. 275, 279-280 [124 L.Ed.2d 182, 189-190], for this proposition, neither of which involve improper joinder of counts. While earlier California cases did not distinguish between federal and state due process rights in discussing the gross unfairness test, our high court has recently stated that in reviewing for federal due process, we determine " 'whether events after the court's ruling demonstrate that joinder actually resulted in "gross unfairness" amounting to a denial of defendant's constitutional right to fair trial or due process of law.' " (*O'Malley, supra*, 62 Cal.4th at p. 969, quoting *Merriman, supra*, 60 Cal.4th at p. 46.) And unlike the *Chapman* analysis, where the burden is on the People to demonstrate harmlessness, as we have said, the defendant has the "high burden" of showing gross unfairness and that he was denied due process of law in this context. (*O'Malley*, at p. 970; *Soper, supra*, 45 Cal.4th at p. 783; *Ybarra, supra*, 245 Cal.App.4th at p. 1438.)

We conclude that the joinder here did not result in gross unfairness. The evidence known to the trial court when it ruled on the defense motion to sever count six differed little from the evidence ultimately introduced at trial. Although at trial S.A. testified that the Smith & Wesson handgun discovered in codefendant's backpack was not the gun used in the robbery, this evidence did not result in gross unfairness. Indeed, if anything, that testimony inured to defendant's benefit. Based on S.A.'s testimony, the jury would not have connected codefendant, or defendant, to the robberies based on codefendant's possession of the handgun found in the codefendant's backpack.

27

We do not agree with defendant that the evidence of his guilt was "far from overwhelming," or that "the jury likely used the strong evidence regarding Count 6 to fill in the evidentiary gaps related to the charges in Counts 1 through 5." Nor do we agree with defendant that the jury "could have used evidence from Count 6 as propensity evidence to convict [him] of the offenses in Counts 1 through 5," depriving him of his constitutional rights to due process and a fair trial. The evidence of defendant's guilt was strong and we conclude that defendant has failed to establish a reasonable probability that the joinder of count six affected the jury's verdicts on the other counts. Thus, he has failed to establish gross unfairness. (*Merriman, supra*, 60 Cal.4th at p. 49; *Ybarra, supra*, 245 Cal.App.4th at p. 1438; *People v. Grant* (2003) 113 Cal.App.4th 579, 588 (*Grant*).)

At trial, S.A. positively identified defendant as one of the two individuals who robbed him and placed him in the trunk of his vehicle. Previously, in viewing a photo lineup on July 18, 2013, S.A. had identified defendant as the man who had stood next to him at the driver's-side door, and expressed "300 percent" certainty concerning his identification. Defendant's fingerprint was found on the trunk of S.A.'s Charger. Defendant's testimony suggested an explanation for the presence of his fingerprint and palm print on S.A.'s vehicle. However, the jury did not find the explanation compelling. While defendant testified that he purchased marijuana from S.A. through the window of S.A.'s car, defendant's fingerprint was found on the Charger's trunk, where the robbers placed S.A. before continuing to look through the vehicle. In describing the alleged marijuana transaction, defendant testified that he did not recall touching the trunk of the car, nor given the story he told the jury, would there have been any reason to touch the trunk.

A.L.G. identified defendant at trial as one of the two individuals who entered her apartment with S.A.'s keys and took guns and her cell phone. While she had been unable previously to identify defendant with certainty in viewing a photo lineup and a physical lineup, at trial she was certain of her identification of defendant as one of the robbers.

28

The perpetrators who entered the apartment did so by using keys which had been taken from S.A. minutes earlier, adding even greater force to the nearly inescapable conclusion that the two individuals who robbed S.A. were the same two who robbed A.L.G.

Defendant cites defense evidence introduced during the trial in supporting his claim of gross unfairness. In *Ybarra*, we held "a defendant cannot create a due process violation from a trial court's refusal to sever before trial based on testimony he gives later during trial—at least where the defendant provided no information to the trial court about his prospective testimony prior to the court's ruling. To hold otherwise would allow defendants to cause a due process error with their own testimony and then cry foul on appeal." (*Ybarra, supra*, 245 Cal.App.4th at p. 1439.) We conclude the same applies to testimony presented by defense witnesses where no offer of proof was made pretrial.

But even assuming we should consider defendants' evidence in determining gross unfairness, the jury obviously rejected the argument that defendant and codefendant both had significant limps and that therefore defendant and codefendant could not have been the perpetrators. Similarly, the jury rejected defendant's other attempts to discredit the identifications. The evidence attacking the identifications all came from defendants' witnesses, including defendant, all of whom were biased or had an interest in the outcome of the case. (See Evid. Code, § 780, subd. (f) [in determining credibility of a witness, jury may consider "existence or nonexistence of a bias, interest, or other motive"].) For example, the timing of when defendant received his tattoos was based on his own testimony, and nine months went by before defendant was apprehended in Louisiana. Based on the record before us, the gun found in the backpack had nothing to do with the jury's rejection of evidence defendants introduced to discredit the identification.

In addition to the trial evidence we consider whether the prosecutor exploited in closing argument the evidence underlying the count defendant asserts should have been severed. (See *Ybarra, supra*, 245 Cal.App.4th at p. 1440 [prosecutor did not ask the jury to draw an impermissible inference from the count that the defendant argued should have

29

been severed].) Here, the prosecutor did not argue that the gun from the backpack related to the other counts. Nor did the prosecutor argue that codefendant's possession of that gun could be used as proof of the other counts. (See *O'Malley*, *supra*, 62 Cal.4th at p. 970 [noting the prosecutor's argument was a circumstance to consider in determining gross unfairness amounting to a due process violations and reasoning and that the prosecutor did not seriously argue similarities between the counts as evidence the defendant committed the charged crimes]; cf., *Grant, supra*, 113 Cal.App.4th at p. 588 [among a convergence of factors resulting in a due process violation, prosecutor "urged the jury to draw the impermissible inference that, because defendant possessed stolen computer equipment (count 2), he burgled the school for computer equipment (count 1)"; *People v. Earle* (2009) 172 Cal.App.4th 372, 409-411 [joinder of an indecent exposure charge with a sexual assault charge resulted in a due process violation, in part because the prosecutor relied heavily on the former to prove guilt on the latter; "[i]t is no exaggeration to say that [the prosecutor] mentioned the indecent exposure at every opportunity, on every conceivable pretext, and for every possible purpose"].)

Additionally, as the People observe, the trial court explicitly instructed the jury that it was to "separately consider the evidence as it applies to each defendant. You must decide each charge for each defendant separately." (CALCRIM No. 203.) As our high court has observed in a case involving the denial of severance of counts, " 'We presume the jury understood and followed this instruction.' " (*O'Malley, supra*, 62 Cal.4th at p. 970.) Certainly, the jury was just as capable of following this instruction as it was concerning the instruction limiting the use of defendant's prior convictions and misconduct—evidence that was far more likely to show propensity than the gun found in

30

the backpack—to a determination of his credibility as a witness.[10]  Furthermore,

defendant has made no showing that the jury did not follow the instructions in

CALCRIM No. 203.  (See *Merriman, supra*, 60 Cal.4th at pp. 48-49 [noting that the

defendant made no showing rebutting the presumption that the jury followed the

" 'decide each count separately' " instruction].)

Defendant has failed to carry his burden of showing a reasonable probability that

the joinder affected the jury's verdicts and thus that joinder resulted in gross unfairness

amounting to a denial of defendant's constitutional right to fair trial or due process of

law.  (*Merriman, supra*, 60 Cal.4th at p. 49; *Ybarra, supra*, 245 Cal.App.4th at p. 1438.)

## II.  Sufficiency of the Evidence to Support Conviction of Kidnapping to Commit Robbery

### A.  Defendant's Contentions

Defendant asserts that his conviction for kidnapping to commit robbery must be

reversed because the evidence was legally insufficient to establish that the movement of

S.A. was more than incidental to the commission of the robbery, and/or that it increased

the risk of harm to S.A.  More specifically, defendant asserts that the movement of S.A.

was merely incidental to the commission of the robbery, and suggests the movement

actually decreased the risk of harm to S.A. because, once placed in the trunk, he no

longer found himself at gunpoint.  Defendant also emphasizes the short distance

involved.

We conclude that the evidence was sufficient to establish the asportation

requirement for kidnapping for robbery.  The evidence established that the movement of

S.A. from the driver's seat of his car to the trunk, under the circumstances, was more than

---

[10]  Using CALCRIM No. 316, the trial court instructed in pertinent part:  "If you find that a witness has been convicted of a felony or other misconduct, you may consider that fact only in evaluating the credibility of the witness's testimony."

31

merely incidental to the commission of the robbery, and it increased the risk of harm to S.A. Accordingly, we conclude that the evidence was legally sufficient to support the conviction of kidnapping to commit robbery.

## B. Standard of Review

"When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*People v. Banks* (2015) 61 Cal.4th 788, 804 (*Banks*).) In reviewing for substantial evidence, we must accept all logical inferences that the jury may have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396 (*Maury*), disapproved on another ground in *Barnett v. Superior Court* (2010) 50 Cal.4th 890, 901.) " 'Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it.' " (*People v. Flores* (2016) 2 Cal.App.5th 855, 871 (*Flores*).) Thus, " '[i]f the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Kaufman* (2017) 17 Cal.App.5th 370, 381.)

## C. Kidnapping to Commit Robbery

Section 209, subdivision (b)(1), provides that "[a]ny person who kidnaps or carries away any individual to commit robbery . . . shall be punished by imprisonment in the state prison for life with the possibility of parole." However, to satisfy the asportation requirement, the movement of the victim must be "beyond that merely incidental to the commission of" the robbery, and the movement must "increase[] the risk of harm to the

victim over and above that necessarily present in, the intended underlying offense."
(§ 209, subd. (b)(2); *People v. Simmons* (2015) 233 Cal.App.4th 1458, 1471 (*Simmons*).)
"The statute previously required that the movement *substantially* increase the risk of
harm to a victim, but it was amended in 1997 to require only that the movement increase
the risk of harm, but not that the increase be substantial." (*Simmons*, at p. 1471.)

"As to whether the movement was more than merely incidental to the commission
of the crime, 'the jury considers the "scope and nature" of the movement, which includes
the actual distance a victim is moved. [Citations.] There is, however, no minimum
distance a defendant must move a victim to satisfy . . . ' this element. [Citation.] As to
whether the movement increased a victim's risk of harm, the jury considers ' " 'such
factors as the decreased likelihood of detection, the danger inherent in a victim's
foreseeable attempts to escape, and the attacker's enhanced opportunity to commit
additional crimes. [Citations.] The fact that these dangers do not in fact materialize does
not, of course, mean that the risk of harm was not increased.' " ' [Citations.] . . . Simply
stated, 'the movement must be more than incidental *and* must increase the inherent risk
of harm.' [Citation.] Application of the foregoing factors in a particular case 'will
necessarily depend on the particular facts and context of the case.' " (*Simmons, supra*,
233 Cal.App.4th at pp. 1471-1472.) The two prongs or elements—whether the
movement was merely incidental to the robbery and whether it increased the risk of harm
to the victim—"are not mutually exclusive but are interrelated." (*People v. Vines* (2011)
51 Cal.4th 830, 870 (*Vines*), overruled on another ground in *People v. Hardy* (2018) 5
Cal.5th 56, 103-104.) "[E]ach case must be considered in the context of the totality of its
circumstances." (*People v. Dominguez* (2006) 39 Cal.4th 1141, 1152 (*Dominguez*).)

### D. Analysis

After defendant approached S.A. in his car and codefendant entered the car and
pointed a gun at S.A., both defendant and codefendant began to pat down S.A.'s pants,
and one of them removed S.A.'s wallet. Codefendant removed the keys from the ignition

of S.A.'s vehicle and grabbed S.A.'s phone. They ordered S.A. to get out of the car. Defendant then grabbed S.A.'s hands and "pulled" S.A. out. After defendant chased an unidentified individual away from the area, defendant opened the trunk. Codefendant continued to point the gun at S.A.'s head, and defendant and codefendant told S.A. to get into the trunk. With the gun still pointed at his head, S.A. was moved six to eight feet from where he had been to the trunk of the vehicle. During the movement, S.A. begged, "Don't do this, please don't do this." Thereafter, defendant and codefendant "shoved" S.A. into the trunk and attempted to close it, but it would not close all the way. S.A. explained that he is a "big guy" and did not fit easily into the trunk. Someone had to slam the trunk lid down on him to get it to close.

From inside the trunk, S.A. could hear defendant and codefendant "going through the car." For a period of five to ten minutes, he "heard stuff moving, doors opening, my dash opening, my arm rest opening, just . . . heard them going through the car." During this time, S.A. was scared. He did not know what was going to happen, but he thought he would probably never see his family again. Once it grew quiet, S.A. pulled the emergency release lever in the trunk and opened it. S.A. saw no one was around his car, and so he got out of the trunk. Defendant and codefendant had already left the area. S.A. then used Hollis's cell phone to call the police.

### 1. *Merely* Incidental

Forcibly pulling S.A. out of the car, moving him to trunk at gunpoint, and forcing him inside of the trunk was not movement that was *merely* incidental to committing the robbery. It was "beyond . . . merely incidental." (§ 209, subd. (b)(2).) " 'Incidental' means 'that the asportation play no significant or substantial part in the planned [offense], or that it be a more or less " 'trivial change[] of location having no bearing on the evil at hand.' " ' " (*People v. James* (2007) 148 Cal.App.4th 446, 454 (*James*).) A jury could reasonably find that placing S.A. in the trunk was a significant part of the planned offense here since it allowed the perpetrators to look through the car unimpeded and to make

34

their escape without their victim's knowledge; moreover, being forced into the trunk of the car is not a trivial change of location.

While significant, the movement here was not necessary to commit the robbery. " '[A] movement unnecessary to a robbery is not incidental to it at all.' [Citations.] 'Lack of necessity is a sufficient basis to conclude a movement is not *merely* incidental.' " (*People v. Leavel* (2012) 203 Cal.App.4th 823, 835, fn. omitted & italics added, quoting *James, supra*, 148 Cal.App.4th at p. 455.) For example, S.A. was not moved *to the items to be taken in the robbery*, such that the movement would be necessary to effectuate the taking and thus merely incidental thereto. (E.g., *People v. Adame* (1971) 4 Cal.3d 417, 418 [in the course of robbing a supermarket, the defendants caused 2 employees to move from the check stand and manager's office to the safe; these movements were merely incidental to the robberies]; *People v. Washington* (2005) 127 Cal.App.4th 290, 298-300 [movement of bank employees to and from vault; "[t]he rule to be derived from these cases is that robbery of a business owner or employee includes the risk of movement of the victim to the location of the valuables owned by the business that are held on the business premises"].) Here, defendant and his crime partner did not need to move S.A. to the trunk of the vehicle to commit the robbery, as demonstrated by the fact that they had already taken a number of items—including S.A.'s wallet, keys, and phone—before moving him at all. Anything else they could have found would have been in the interior of the vehicle. They could have completed the robbery in S.A.'s presence.

In determining whether movement was merely incidental, we also look to the actual distance the victim was moved. (*Vines, supra*, 51 Cal.4th at pp. 869-870; *Simmons, supra*, 233 Cal.App.4th at p. 1473.) But a short distance does not necessarily mean the movement was merely incidental, particularly when it is a significant part of the plan. Indeed, as we have noted, there is no minimum distance a defendant must move a victim to satisfy the first prong. (*Vines*, at p. 870.) "Actual distance 'must be considered in context, including the nature of the crime and its environment. . . . [E]ach case must

35

be considered in the context of the totality of its circumstances.' " (*People v. Robertson* (2012) 208 Cal.App.4th 965, 984, quoting *Dominguez, supra*, 39 Cal.4th at p. 1152.) " 'Where movement changes the victim's environment, it does not have to be great in distance to be substantial.' " (*Robertson*, at p. 986.) "In some cases a shorter distance may suffice in the presence of other factors, while in others a longer distance, in the absence of other circumstances, may be found insufficient." (*Dominguez*, at p. 1152.) Here, the movement changed S.A.'s environment from an open area, to one where he was concealed and out of public view, decreasing the possibility of detection, escape, or rescue. (*Id*. at p. 1153.) The movement in this case is unlike the brief and trivial movements section 209, subdivision (b)(2), is intended to exclude.

Defendant points out that placing S.A. in the trunk allowed them to look for more property to steal, and from this he maintains the movement was incidental to the robbery. He asserts that putting S.A. into the trunk facilitated the robbery. But this did not make the movement *merely* incidental, where it can be reasonably inferred that it was a significant part of the plan, including a means to ensure a successful escape. (See *People v. Laursen* (1972) 8 Cal.3d 192, 200 [when a jury can infer that the kidnapping of an individual was to effect an escape from a robbery, the kidnapping is proscribed by the provisions of section 209].)

We conclude that the evidence shows the movement here was not *merely* incidental to the robbery; instead, it was *beyond merely incidental* and was a significant part of the plan.

### 2. Increased Risk of Harm

Defendant also asserts that, upon being moved to the trunk, the risk of harm to S.A. was reduced because "he no longer had a gun pointed at him and he was not in a position where he could be immediately shot . . . ." Defendant overlooks the potential for S.A. to have sustained injury when he was forcibly pulled out of the car or when he was forcibly shoved into the trunk. Indeed, the trunk was so small relative to the size of his

36

body that the trunk lid had to be slammed down upon him to get it to close. He further overlooks the obvious fact that S.A. could have been shot through the trunk lid or, outside of public view, from inside the passenger compartment through the rear seats. In addition, placing S.A. in the trunk increased the risk that defendant and codefendant could transport S.A. away from the scene for a variety of criminal purposes. (Cf. *People v. Jones* (1999) 75 Cal.App.4th 616, 630 (*Jones*) [the defendant moved the victim into a car and intended to drive away with her; she thus was subjected to a multitude of risks not present in the cases relied upon by the defendant].) " ' "The fact that these dangers [did] not in fact materialize does not, of course, mean that the risk of harm was not increased." ' " (*Vines, supra*, 51 Cal.4th at p. 870.) The second prong requires a determination of whether the *risk* of harm was increased over and above that in the underlying robbery by the movement, not whether a specific risk or method of causing harm was actually employed or that a specific harm was actually caused.

Additionally, while S.A. testified that he suffered no *physical* harm during the incident, placing him in the trunk increased his fear and thus the risk of *psychological* harm. The increased risk of harm required by the statute need not be physical; it may be psychological. (*People v. Nguyen* (2000) 22 Cal.4th 872, 885-886; *Simmons, supra*, 233 Cal.App.4th at p. 1471-1472.) S.A. essentially begged for his life just before being forced into the trunk. When defendant and codefendant told him to get into the trunk, he did not know what was going to happen, but he thought he would probably never see his family again. Thus, not only did the movement increase the risk of physical harm, it actually resulted in psychological harm. (See *Simmons*, at p. 472 [noting that the movement not only increased the "*risk* of harm" but also caused "additional harm *in fact*" in the form of psychological harm from fear resulting, in part, from having a gun pushed into his spine during the movement from outside the victim's home to inside].)

As noted, one of several factors to be considered in the totality of the circumstances on the question of increased risk of harm is whether the movement

37

decreased the likelihood of detection. (*Simmons, supra*, 233 Cal.App.4th at p. 1471.) Defendant asserts that moving S.A. to the trunk at gunpoint did not decrease the likelihood of detection; rather it increased it. We disagree. Defendant and codefendant held S.A. at gunpoint in the parking lot before moving him to the trunk. While they may have been briefly exposed as they moved S.A. to the trunk, they were not any more exposed than had they held him at gunpoint by the side of the car instead of walking him to the trunk. By walking S.A. to the trunk, they were so exposed for a shorter period of time. Moreover, after forcing him into the trunk, they could, among other things, search the car at their leisure with a decreased likelihood of detection that would have come from holding S.A. at gunpoint in the open for the public to view. With S.A. secured in the trunk, there was essentially no risk of detection, as there is no reason on this record to believe that anyone in the area would have realized that they were not in their own car. (See *Jones, supra*, 75 Cal.App.4th at pp. 629-630 [once the defendant pushed the victim into the car, she was no longer in public view as when she was in plain sight with the defendant holding his hand over her mouth—a situation which would have aroused concern immediately in any onlookers].) Moreover, moving S.A. to the trunk reduced the likelihood that S.A. himself would be in a position to gather and later report information concerning defendant and codefendant's escape such as a vehicle description and flight direction.

Moving S.A. to the trunk also enhanced the danger inherent if S.A. attempted to escape. It was foreseeable S.A. might attempt to escape while being walked to the trunk in the open, rather than take the chance of being shot after being placed into the trunk. After he was placed in the trunk, S.A. would have had to first unlock and emerge from the trunk, alerting the robbers to the fact that he was attempting escape, and only then begin to flee; thus the danger inherent in an attempted escape escalated after S.A. was forced into the trunk because the likelihood of a successful escape had been diminished. Additionally, had there not been a safety release in the trunk or had the release not

38

worked, S.A. would not have been able to escape even after the robbers left unless and until someone discovered him.

Yet another factor to consider in the increased risk of harm prong is whether the movement enhanced the perpetrators' opportunity to commit other crimes. (*Simmons, supra*, 233 Cal.App.4th at p. 1471.) Secreting S.A. in the trunk provided defendant and codefendant not only with the opportunity to attempt to steal more property from the car, but also to commit an additional and more dangerous crime, the home invasion robbery at S.A.'s apartment, thereby creating a risk of harm to other people. (See *id.* at p. 1472 [accosting victims outside of their residence and forcing them inside allowed the defendants to engage in additional and more dangerous crimes by taking the victims out of public view and providing access to additional victims].)

We conclude there was substantial evidence that the movement here increased the risk of harm over and above the robbery of S.A.

### 3. Substantial Evidence Conclusion

Considering the totality of the circumstances (*Dominguez, supra*, 39 Cal.4th at p. 1152; *James, supra*, 148 Cal.App.4th at pp. 454, 458) and viewing the evidence in the light most favorable to the prosecution, accepting all logical inferences (*Banks, supra*, 61 Cal.4th at p. 804; *Maury, supra*, 30 Cal.4th at p. 396), we conclude that a rational trier of fact could have found, beyond a reasonable doubt, that the movement of S.A. from the driver's seat to the trunk was not merely incidental to the robbery and increased the risk of harm to S.A. and others. (§ 209, subd. (b).) Certainly, we cannot say that "upon no hypothesis whatever is there sufficient evidence to support" these findings. (*Flores, supra*, 2 Cal.App.5th at p. 871.) We conclude that substantial evidence supports defendant's conviction on this count.

### III.  CALCRIM No. 1203 as Modified

### A.  Defendant's Contentions

Defendant asserts that the trial court erred in instructing the jury with a version of CALCRIM No. 1203, modified at the prosecutor's request, because the modified version allowed the jury to convict him of kidnapping to commit robbery on a theory not supported by the evidence.  Specifically, defendant contends that the trial court committed reversible error in modifying CALCRIM No. 1203 to specify that the intent to commit robbery includes the intent to aid in the escape from the robbery.  Defendant asserts that there was no evidence to support a theory that the asportation of S.A. occurred in order to effectuate defendant and codefendant's escape.

We disagree.  We conclude that the theory of liability represented by CALCRIM No. 1203, as modified and given, was supported by substantial evidence.

### B.  Additional Background

At the initial instruction conference, the trial court indicated that it would give CALCRIM No. 1203.  Defendant did not object.

At the close of all evidence, the court indicated that the prosecutor had submitted a request for a pinpoint instruction in connection with CALCRIM No. 1203 based on *People v. Laursen* (1972) 8 Cal.3d 192 (*Laursen*).  Defendant's counsel objected based on the distance of the movement, and codefendant joined in the objection.  The court noted the potential for jury confusion if the jury believed that, once a taking had occurred, the robbery was over, which is not the state of the law as set forth in *Laursen*. The court continued: "So what I would propose to do was to keep it in line with the movement and substantial distance element to modify number two, the element number two as follows:  It reads acting with that intent, because they're referring to intent to commit a robbery, what I propose is acting with the intent to commit robbery, including the intent to aid in the escape from the intended robbery, the defendant took, held or detained."  Defendant's counsel and codefendant's counsel objected and submitted.

40

The court issued a modified version of CALCRIM No. 1203, which read as follows:  "The defendants are charged in Count 1 with kidnapping for the purpose of robbery in violation of . . . [s]ection 209(b).  [¶]  To prove that a defendant is guilty of this crime, the People must prove that:  [¶]  1. The defendant intended to commit robbery; [¶]  2. Acting with the intent to commit robbery *including the intent to aid in the escape from the intended robbery*, the defendant took, held or detained another person by using force or by instilling a reasonable fear;[11]  [¶]  3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance;  [¶]  4. The other person was moved or made to move a distance beyond that merely incidental to the commission of the robbery;  [¶]  5. When that movement began, the defendant already intended to commit robbery; and  [¶]  6. The other person did not consent to the movement.  [¶]  As used here, substantial distance means more than a slight or trivial distance.  The movement must have increased the risk of physical or psychological harm to the person beyond that necessarily present in the robbery.  In deciding whether the movement was sufficient, consider all the circumstances relating to the movement.  [¶] In order to consent, a person must act freely and voluntarily and know the nature of the act."  (CALCRIM No. 1203, as given, italics added.)

### C.  Standard of Review and Applicable Principles

" ' "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." ' "  (*People v. Breverman* (1998) 19

---

**11**  Without the modified text set forth in italics, element number 2 in the standard version of CALCRIM No. 1203 reads:  "2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling a reasonable fear."

Cal.4th 142, 154.) "A trial court must instruct the jury on every theory that is supported by substantial evidence, that is, evidence that would allow a reasonable jury to make a determination in accordance with the theory presented under the proper standard of proof." (*People v. Cole* (2004) 33 Cal.4th 1158, 1206.) An appellate court reviews the trial court's decision to give a particular instruction de novo. (*Ibid*.) In doing so, we must determine whether there was sufficient evidence to support the challenged instruction (*ibid*.), and whether the instructions delivered a correct statement of the law (*People v. Fiu* (2008) 165 Cal.App.4th 360, 370 ["the instructions must be complete and a correct statement of the law"]). Here, we must determine whether a reasonable trier of fact could have found, beyond a reasonable doubt, that the evidence demonstrated that defendant and codefendant moved S.A., at least in part, to effectuate their escape. (See generally *Cole*, at p. 1206.)

### D. Analysis

In *Laursen*, our high court held that "a kidnaping committed while in the act of escaping from the site of a robbery falls within the meaning of 'kidnaping for the purpose of robbery' as proscribed by section 209." (*Laursen, supra*, 8 Cal.3d at p. 196.) The court reasoned: "The assault of the victim, the seizure of his property and the robber's escape to a location of temporary safety are all phases in the commission of the crime of robbery linked not only by a proximity of time and distance, but a singlemindedness of the culprit's purpose as well." (*Id*. at pp. 199-200.) Thus, escape to a location of temporary safety is a phase in the commission of a robbery and where the finder of fact can "reasonably infer[] . . . that the kidnaping of an individual was to effect a robber's escape such kidnaping is proscribed by the provisions of section 209." (*Id*. at pp. 196, 199-200.) In light of *Laursen*, the instruction, as modified, was a correct statement of law.

Of course, "[i]t is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4

42

Cal.4th 1116, 1129.) Thus, only where there is substantial evidence to support the theory that the asportation of the victim was undertaken, at least in part, to effectuate the robber's escape, will it be proper to give an instruction such as the one given by the trial court here.

We conclude that the instruction, as modified and given, was supported by substantial evidence. On this record, a rational trier of fact could have concluded, beyond a reasonable doubt, that the asportation of S.A. from the driver's seat to the trunk of his car was undertaken, at least in part, to effectuate defendant and codefendant's escape. While defendant is correct that S.A. heard the perpetrators rummaging through his car for five to ten minutes after placing him in the trunk, this does not establish that the sole reason that they placed S.A. in the trunk was to take property. The mere fact that the perpetrators did not immediately flee upon placing S.A. in the trunk does not establish, as argued by defendant, that "the movement of [S.A.] to the trunk was not for the purpose of effectuating the robbers['] escape, but rather for the purpose of facilitating the robbery." Based on the trial evidence, the jury could have reasonably inferred that, by placing S.A. in the trunk, defendant and codefendant ensured that S.A. could not continue to observe them and memorize their descriptions, that he could not observe when or how they departed, that he would not see their vehicle or where they went, and that, until S.A. escaped, he would not be able to seek help or contact the police. We conclude that substantial evidence was present to support the theory that the robbers' intent in moving S.A. to the trunk was, at least in part, to aid in their escape.

Because CALCRIM No. 1203, as modified and given to the jury, was both a correct statement of law and supported by substantial evidence, the trial court did not err in issuing the modified instruction.[12]

---

[12] We recommend that the CALCRIM committee consider modifying CALCRIM No. 1203 to provide optional language addressing situations where, as here, there is

## IV. *People v. Franklin*

Defendant was 21 years old at the time of the crimes for which he was convicted.

In *Franklin, supra*, 63 Cal.4th 261, "the California Supreme Court noted that the Eighth Amendment of the United States Constitution prohibition against cruel and unusual punishment prohibits a criminal court from sentencing a minor 'to the functional equivalent of [life without parole] for a homicide offense' without taking into account ' "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" ' [citations]. The court concluded, however, that a juvenile's claim that his sentence of 50 years to life was the functional equivalent of life without parole and thus unconstitutional was moot in light of recent statutory amendments that provided for parole hearings for youthful offenders.[13] [Citations.] The court explained, 'Consistent with constitutional dictates, those statutes provide [the juvenile] with the possibility of release after 25 years of imprisonment [citation] and require the [parole board] to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity." ' [Citation.] [¶] Because the enactment of the statutes meant that the juvenile was 'now serving a life sentence that includes a meaningful opportunity for release during his 25th year of incarceration,' his sentence was 'neither [life without parole] nor its functional equivalent' and 'no *Miller*[14] claim arises.' [Citation.]

---

substantial evidence supporting a finding that during the course of a robbery, the perpetrators moved the victim to, at least in part, effectuate their escape.

[13] See section 3051, subdivision (a), providing for youthful offender parole hearings for defendants who were 18 years of age or younger at the time of the controlling offense. See also section 4801, subdivision (c), requiring that the parole board "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law" at the youthful offender parole hearing.

[14] *Miller v. Alabama* (2012) 567 U.S. 460 [183 L.Ed.2d 407].

Although the court in *Franklin* held that the juvenile offender 'need not be resentenced,' the court remanded 'the matter to the trial court for a determination of whether [the juvenile] was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing' because it was 'not clear' whether the juvenile had been afforded such an opportunity previously. [Citation.] [¶] The court advised, 'If the trial court determines that [the juvenile] did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 [of the Penal Code] and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. [The juvenile] may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to "give great weight to" youth-related factors [citation] in determining whether the offender is "fit to rejoin society" despite having committed a serious crime "while he was a child in the eyes of the law." ' " (*People v. Woods* (2018) 19 Cal.App.5th 1080, 1086-1087 (*Woods*).)

We granted defendant's request for supplemental briefing to address whether he is entitled to a limited remand for the purpose of conducting a *Franklin* hearing. In his supplemental brief, defendant asserts that, because he was younger than 25 years old at the time he committed the charged offenses, he will be entitled to a youth offender parole hearing during the 20th year of his sentence. (See § 3051, subds. (a)(1), (b)(2).) Defendant asserts that he did not have a sufficient opportunity to place on the record information relevant to his eventual youth offender parole hearing, and, therefore, he

must be afforded the opportunity to do so.  The People concede that defendant is entitled to a limited remand for a *Franklin* hearing, and, under the circumstances of this case, where, among other things, defendant was sentenced prior to the amendment of section 3051 which first extended its applicability to him (§ 3051, as amended by Stats. 2015, ch. 471, § 1), we agree (cf. *Woods, supra*, 19 Cal.App.5th at pp. 1088-1089 [§ 3051 was applicable to the defendant at the time he was sentenced; no reasonable basis to conclude the defendant was not afforded the opportunity to make the relevant record and therefore no basis for a *Franklin* remand]).  Therefore, we shall remand so that the trial court may conduct a *Franklin* hearing.

### V.  Senate Bill No. 620

While this case was pending on appeal, the Governor signed Senate Bill No. 620 (2017-2018 Reg. Sess.) (Senate Bill 620), effective January 1, 2018.  Following the enactment of Senate Bill 620, section 12022.53 now includes language stating:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section.  The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law."  (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2.)  Prior to the enactment of Senate Bill 620, courts did not have discretion to strike or dismiss these enhancements.  The former statutory language explicitly provided that the courts "shall not strike" enhancement allegations.  (§ 12022.53, subd. (h).)

We granted defendant's request for supplemental briefing on the impact of Senate Bill 620.  Defendant asserts that his case must be remanded to the trial court to permit the court to exercise its newly authorized discretion to strike the section 12022.53, subdivision (b), firearm enhancement.  Defendant asserts that the amendment which now grants sentencing courts the discretion to strike or dismiss the section 12022.53 firearm enhancement applies retroactively to his case based on legislative intent and under the rule in *In re Estrada* (1965) 63 Cal.2d 740.

The People concede that the amendment to section 12022.53 should be afforded retroactive application to nonfinal judgments. However, the People assert that remanding for resentencing in this case would serve no purpose. Relying on *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 (*Gutierrez*), the People argue that, based on the trial court's imposition of upper terms on three counts, its imposition of consecutive rather than concurrent terms, and the presence of aggravating circumstances and "a relative lack of mitigating circumstances," there is no reasonable probability that the trial court would strike the firearm enhancement on remand.

We accept the People's concession concerning retroactivity and conclude that the effects of Senate Bill 620 do indeed apply retroactively. (*Woods, supra*, 19 Cal.App.5th at p. 1091.) Accordingly, we proceed to consider the People's argument that remand would serve no purpose.

In *Gutierrez*, the Court of Appeal considered whether it should remand to allow the trial court to decide whether it would dismiss a strike conviction under section 1385 in a three strikes case following our high court's decision in *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. (*Gutierrez, supra*, 48 Cal.App.4th at pp. 1895-1896.) The *Gutierrez* court concluded that, under the circumstances of the case, "no purpose would be served in remanding for reconsideration." (*Gutierrez*, at p. 1896.) In reaching this conclusion, the *Gutierrez* court noted that the trial court had done the following at sentencing: expressly "indicated that it would not, in any event, have exercised its discretion to lessen the sentence"; stated that imposing the maximum sentence was "*appropriate*" (*ibid.*, italics added); and imposed an upper-term sentence on the base term and two discretionary one-year enhancements, which were not required under the three strikes law. (*Gutierrez*, at p. 1896.) We also note that, in declining to strike the discretionary sentences for the one-year enhancements, the trial court in *Gutierrez* expressly stated: " 'there really isn't any good cause to strike it. There are lots of

47

reasons not to, and this is the kind of individual the law was intended to *keep off the street as long as possible*.' " (*Ibid.*, italics added.)

At sentencing here, in choosing to impose the upper term of six years on count four, the trial court emphasized defendant's prior convictions and that defendant's "conduct is getting worse and worse as time goes on." Additionally, the trial court imposed upper terms on counts two and three before staying execution of those sentences pursuant to section 654. Further, the trial court imposed consecutive terms rather than concurrent terms. And we note that the trial court did not dismiss the vicarious arming enhancement found true under section 12022, subdivision (a), for which there was no statutory prohibition against dismissals under section 1385.

"Remand is required unless the record reveals *a clear indication* that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so." (*People v. Almanza* (2018) 24 Cal.App.5th 1105, 1110, italics added; *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.) While it may be the case that the trial court would choose not to exercise its newly authorized discretion to strike the section 12022.53, subdivision (b), firearm enhancement, on this record, we cannot be certain that it would not exercise that discretion. In the absence of a clear indication that remand would serve no purpose, and additionally, in light of the fact that we are remanding for a *Franklin* hearing, we agree with defendant that the matter must be remanded for the trial court to consider whether to exercise its discretion to strike the section 12022.53, subdivision (b), enhancement.

## DISPOSITION

The judgment is affirmed.  The matter is remanded to the trial court for a *Franklin* hearing and for the trial court to exercise its discretion under section 12022.53, subdivision (h), whether to strike the section 12022.53, subdivision (b), enhancement.

      s/MURRAY    , J.

We concur:

      s/HULL    , Acting P. J.

      s/RENNER    , J.